*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CF-1871 & 12-CF-1985

CHAMONTAE WALKER
AND
COREY D. YATES, APPELLANTS,

v.

UNITED STATES, APPELLEE.

08/24/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(CF1-5957-11, CF1-14652-11)

(Hon. Thomas J. Motley, Trial Judge)

(Argued July 1, 2015                                    Decided August 24, 2017)

*Thomas C. Paynter* for appellant Walker.

*Todd F. Braunstein*, with whom *Matthew Thome* was on the brief, for appellant Yates.

*James M. Perez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Sharon Donovan*, and *Emily A. Miller*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and FISHER, *Associate Judges*, and REID, *Senior Judge*.

GLICKMAN, *Associate Judge*: Appellants Chamontae Walker and Corey Yates were indicted with Meeko Carraway on charges relating to the September 25, 2010, murder of Darrell Hendy. Carraway, who fired the shots that killed Hendy, pleaded guilty to second-degree murder. Walker and Yates, charged as Carraway's accomplices in the shooting, went to trial. Walker was convicted of three felonies – first-degree murder while armed, conspiracy to commit murder, and accessory after the fact to murder – and a misdemeanor charge of assaulting, resisting, or interfering with the police officer ("APO") who arrested him shortly after the shooting. Yates was convicted of second-degree murder while armed and accessory after the fact. In these consolidated appeals, Yates claims the government presented insufficient evidence to convict him of murder and suppressed evidence that he was not guilty of being an accessory after the fact. In addition, both appellants claim the trial court erred in rulings on evidence and in allowing the prosecutor to misstate the evidence in closing argument.

## I.

On September 25, 2010, Darrell Hendy was walking in the 800 block of Southern Avenue when Meeko Carraway approached him from behind and shot him. At appellants' trial, the government presented evidence that Walker had been

feuding with Hendy and instigated the shooting, and that he and Yates were Carraway's accomplices and after-the-fact accessories.

Ebony House, Walker's girlfriend at the time of the murder, testified that Walker and Hendy had a falling out in the spring of 2010 and were not on speaking terms. Walker told House about a month before the shooting that he believed Hendy and another man had "put a hit out on him." During the summer of 2010, Walker acted "paranoid" whenever he saw Hendy.

On the morning of September 25, Walker and House had what she described at trial as a long and physically violent fight at his mother's house, where the two were living. Walker eventually calmed down, but as far as House was concerned, their relationship was "over." House recalled that after the fight, Walker received two phone calls that she partially overheard. The first call, at around noon, was from either Carraway or Yates. House heard Walker say "yeah, I'll meet you at the building." The second call was from a man she knew as "Uncle Poochie." Walker told her that Uncle Poochie, who was in his car outside, was taking him to Realco, a gun store in Maryland, "to go get bullets."

Uncle Poochie, whose real name was Kenneth Buchanan, testified that Walker had called him and asked to be picked up. Buchanan drove Walker to

Realco, where Walker purchased a box of 9mm ammunition.  Buchanan recalled that Walker was in a solemn mood and said he was "angry at his girl."

After buying the ammunition, Walker asked Buchanan to drive him to 10th Place S.E. in the District to pick up his "cousins," Yates and Carraway.  They went to 10th Place and Savannah Street, which was where Yates resided with his grandfather.  Walker got out of Buchanan's car and spoke privately with Yates and Carraway in the alley.  Buchanan was unable to hear their whole conversation, but he did hear Walker say "something B" with regard to "his girl."  The three men – Walker, Carraway, and Yates – returned to Buchanan's car and asked him to drive them to an apartment building at 800 Southern Avenue.  On the way, Yates sat in the back of the car next to the box of ammunition Walker had purchased. Buchanan heard Yates ask what kind of bullets they were.

As they approached their destination, Walker told Buchanan to slow down, and both Walker and Yates said, "There goes the van."  This was an apparent reference to Darrell Hendy's van, which subsequently was found in a parking lot at 800 Southern Avenue.  Buchanan asked, "What van?"  Yates told him, "Don't worry about it."  Walker said "they was just looking for somebody" and he and Yates told Buchanan to keep going and drive around the corner.  Yates then said,

"Let's suit up." Over defense objection, Buchanan testified he understood this "to mean to do bodily harm to somebody. . . . you want to hurt somebody." Frightened, Buchanan said to the group, "Y'all ain't about to do nothing crazy, because if you is, get out the car." Buchanan dropped Walker, Yates, and Carraway off at the side of the building at 800 Southern Avenue and left them there.

Two months later, Walker and Ebony House started dating again and she asked him about the rumors she had heard concerning Hendy's shooting on September 25.[1] Walker admitted his involvement in the shooting and described to House what happened. Over Yates's objection, the trial court ruled that Walker's incriminating statements to House were declarations against Walker's penal interest and hence admissible as affirmative evidence against Yates.[2] House

---

[1] Walker and House broke up after their fight on the morning of September 25. Then, as explained further below, Walker was arrested that night on an unrelated charge. He spent more than half of the next two months in and out of jail. After being released on November 16, 2010, he and House started dating again. Within a couple of days, he told House about the shooting.

[2] Walker's statements were substantively admissible at trial against Walker himself, of course, because they were the statements of a party-opponent. *See Chaabi v. United States*, 544 A.2d 1247, 1248 (D.C. 1988). This ground is not to be "confused with statements against interest, a distinctly separate ground of admissibility." *Johnson v. Leuthongchak*, 772 A.2d 249, 250 n.4 (D.C. 2001).

recalled Walker telling her that after "Uncle Poochie" took him to Realco to get bullets, they drove directly to the "high-rise" at 800 Southern Avenue, where Walker met up with Carraway and Yates.[3]  After leaving Uncle Poochie, the three men went to apartment 405.  There, House testified, Walker "said he was mad because we had broken up, and he told Meeko and Corey, you all I got, you all I got, somebody gonna die today."

Carraway then told Walker that Darrell Hendy was "down the street." Walker retrieved his gun from somewhere in the apartment and gave it to Carraway.  Carraway loaded the weapon with Walker's bullets.  The three men then went downstairs "[a]nd all three of them walked down the street" in Hendy's direction.

Walker told House they found Hendy sitting on a stoop in the Tiger Market parking lot on the Maryland side of Southern Avenue.  The three men crossed over to that side and remained there for a while, keeping watch on Hendy.  At some point, Carraway announced, "I'm about to do it, Cuz. I'm about to do it," but

---

[3]  In this and some related respects, House's account of what Walker told her conflicted with Buchanan's testimony.  The conflicts are at the heart of one of the claims we discuss below, namely, whether the prosecutor misstated the facts in closing argument.

Walker warned him not to because there were too many cameras in the area. Walker and Yates then crossed back to the District side of Southern Avenue and waited there while Carraway stayed on the Maryland side in their sight. In the course of the encounter, Walker told House, Hendy asked "what's up," Walker said "what's up" back to him, and he and Hendy "was giving each other dirty looks, like mugging on each other."

It appeared to Walker that Hendy did "not feel right about the situation." Hendy got up, crossed the street back to the District side, and headed on foot toward his van in the parking lot at 800 Southern Avenue. Walker gestured for Carraway to come back across the street to join them, which he did. Walker told House that he, Carraway, and Yates then proceeded to follow Hendy as he walked away. Carraway went ahead of Walker and Yates and closed in on Hendy from behind. Next, Carraway looked back at his two friends, told them to "watch this," and then shot Hendy multiple times from behind.[4] Walker, Yates, and Carraway then fled together into the high-rise at 800 Southern Avenue and back to apartment 405.

---

[4] The medical examiner found nine bullet holes in Hendy's body.

Video footage taken by security cameras just before and after the shooting and introduced in evidence at trial corroborated much of the story House recounted. The footage showed Yates and Walker waiting across the street from Hendy; Hendy and another person[5] walking toward Hendy's van; Carraway crossing the street and joining Walker and Yates; Carraway passing Walker and Yates, turning back to say something, and continuing after Hendy; and then, after the shooting, Carraway running into the apartment building at 800 Southern Avenue, followed by Walker and Yates. The shooting itself was not caught on video.

Walker's cousin, Orlando Smith, testified at trial that he was in apartment 405 at 800 Southern Avenue at the time of the shooting and heard the gunshots. Moments later, Walker, Yates, and Carraway arrived at the apartment. The three men were sweating. Smith testified that Walker advised Carraway to cut his hair and helped him begin doing it. Walker and Yates then left the apartment together.

---

[5] This was Raymond Pray, who testified that he had been hanging out with Hendy at the Tiger Market shopping center. Pray was walking with Hendy toward 800 Southern Avenue when the shooting started. He immediately ran. When he looked back, all he saw was Hendy lying on the ground. However, shortly before he and Hendy left the shopping center, Pray testified, he ran into Walker in a carry-out there. Pray and Walker were acquainted and on good terms, and they greeted each other. Pray "wasn't paying attention" to whether anyone was with Walker and left without having further conversation with him.

Carraway did not go with them. Police searching the building in the immediate aftermath of the shooting (based on witness reports that the suspects had fled into the building) found and arrested Carraway while he was still in apartment 405. However, because the police lacked sufficient evidence at that time to charge him for Hendy's shooting, Carraway soon was released.

The police search of the building continued, floor by floor. Officer Sean Corcoran, who had assisted in Carraway's arrest in apartment 405, found Walker in another apartment on the eleventh floor. When Corcoran discovered him, Walker was "straddling the balcony as if he was going to jump off or climb down." As Corcoran tried to handcuff him, Walker grabbed for the officer's service pistol, but Corcoran succeeded in restraining him. This was the conduct that led to the APO charge against Walker. Like Carraway, however, Walker was not charged at this time for Hendy's shooting, and he was released two days later.

The basis for the accessory-after-the-fact charges was evidence that Walker and Yates helped Carraway hide out in North Carolina a few days after the shooting when it became clear to them that the police were about to arrest

Carraway for Hendy's murder.[6] On September 29, Yates, Walker, and Carraway were observed at unoccupied property belonging to Yates's family in the town of Seaboard, North Carolina. Shamel Prude and Kathleen Wade, two neighbors who

---

[6] As discussed below, the police learned Yates was a witness to Hendy's murder and brought him in for questioning on September 27. Yates identified Carraway as the shooter. The prosecution theory that Yates and Walker knew Carraway's arrest was imminent and helped him to evade it was set forth in the government's closing argument as follows:

> Mr. Yates realized two days after the murder that the police could put him on the scene, because they came and got him and took him to the station for questioning. And Mr. Yates, realizing the police had information and were on to what had happened and who was present, told them Meeko Carraway was the shooter in this case. And he knew and understood, it's reasonable to infer, that when he identified the shooter in the murder to the police, an arrest warrant was going to issue for murder for that person. And in fact the next day an arrest warrant did issue for murder for Meeko Carraway based on the word of Corey Yates.

> So what did he do? Mr. Yates? The next day, perhaps because he felt guilty for snitching on his friend, perhaps because he realized the person he had just identified to police would now perhaps be picked up and be a witness against him, perhaps because he felt bad this was his good friend and he knew an arrest was coming and he wanted to get him out of Dodge. Mr. Yates, along with Mr. Walker, took Meeko Carraway to Seaboard, North Carolina, a sleepy town two states away, where Meeko Carraway had no association.

lived across the street and who were well-acquainted with Yates and his family, testified at trial.

Shamel Prude testified that he walked over to the property after seeing a blue van in the driveway and found Yates there with two other men he did not know. At trial he identified those two men as Walker and Carraway. Prude chatted with them briefly. After he went to bed that night, he heard the van drive off. The next day, Prude saw only Carraway at the house. Prude lent him a telephone to use and brought him something to eat. That evening, Prude testified, Ms. Wade's daughter and her husband gave Carraway a ride out of town, and Prude accompanied them in the car. Carraway was alone and had no luggage.[7]

Kathleen Wade testified that she too saw a blue van at Yates's family's house. The next morning, September 30, 2010, Prude informed her that Yates was there and that he had "brought two guys with him." Later in the day Carraway appeared at her house and asked to use her phone. By then Yates was gone. Wade did not think Carraway was supposed to be there by himself and told him to call

---

[7] The following day, which would have been October 1, 2010, a local police officer came by and showed Prude photographs of the two men Prude had seen with Yates.

Yates to come pick him up. While Carraway was on the phone with Yates, Wade asked to speak to him. She asked Yates why he had left Carraway "stranded" at the empty house. Yates answered that it was his family house and that he would be coming back. Wade asked him how he had gotten into the house and Yates told her his grandfather had given him the key. Afterward, Carraway told Wade that Yates was coming back for him. However, as the day wore on, Yates did not appear. That night, Wade arranged for her daughter and her daughter's fiancé to drive Carraway to Roanoke Rapids, North Carolina, where he claimed to know someone.[8]

Walker presented no evidence at trial. Yates called two witnesses. Detective Robert Cephas testified that he interviewed Yates on September 27, and that Yates identified Carraway as the person who shot Hendy. The police obtained a warrant for Carraway's arrest the next day. The second witness was Samuel Hamilton. Hamilton, an attorney, testified that Yates came to see him in late September 2010 to inquire whether it would be wise for a person who might be facing some charges "to get a lawyer and to approach the authorities." Hamilton said Yates also expressed vague ("gloriously indefinite") concerns about possible

---

[8] Carraway soon returned to the District of Columbia and, on October 12, 2010, he turned himself in to the police.

retaliation. Hamilton had a subsequent meeting with Yates, Walker, and Carraway, in which they asked him whether an attorney could help someone "who might have some concerns about people in the community about maybe retaliating against him or doing something in the community because they think that he might have been involved in something, some criminal activity." The testimony of Detective Cephas and Mr. Hamilton supplied the evidentiary predicate for Yates's defense claim that any actions he took following Hendy's murder were not done with the intent to hinder or prevent Carraway's arrest.[9]

## II.

Appellants present several grounds for reversal of their convictions. Yates claims the government presented insufficient evidence to convict him of murder as an aider and abettor, and that it withheld materially exculpatory evidence bearing on the accessory-after-the-fact charge against him. In addition, appellants claim the trial court erred in ruling that Walker's admissions to Ebony House were statements against penal interest; in permitting Buchanan to opine as to the meaning of Yates's remark, "Let's suit up"; in allowing Officer Corcoran to testify

---

[9] This was a defense to the accessory-after-the-fact charge. Yates's defense to the murder charge was that he was an innocent bystander.

that unknown persons had implicated Walker in the shooting; and in allowing the prosecutor, in closing argument, to misstate the evidence regarding when and where Walker allegedly told Yates and Carraway that "somebody gonna die today." We address the claims in that sequence.

### A. Sufficiency of the Evidence of Aiding and Abetting

Yates contends the evidence was insufficient to prove that he did anything to aid or abet the commission of Hendy's murder or that he had the mental state required to be guilty of second-degree murder as an aider and abettor. We do not agree.

A challenge to the sufficiency of the evidence to support a criminal conviction requires the appellate court to assess the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact . . . ."[10] We must "deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

---

[10] *Gibson v. United States*, 792 A.2d 1059, 1065 (D.C. 2002) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)).

essential elements of the crime beyond a reasonable doubt.'"[11]  The evidence need

not "negate every possible inference of innocence" to meet this standard.[12]

Second-degree murder is a killing done with "malice aforethought,"[13] a term

meaning "either specific intent to kill or inflict serious bodily harm, or a conscious

disregard of the risk of death or serious bodily injury."[14]  Our aiding-and-abetting

statute provides that "[i]n prosecutions for any criminal offense, all persons

advising, inciting, or conniving at the offense, or aiding or abetting the principal

offender, shall be charged as principals . . . ."[15]  For such criminal liability to

attach, of course, the encouragement or aid must be deliberate, not accidental:  "In

order to aid and abet another to commit a crime[,] it is necessary that a defendant

in some sort associate himself with the venture, that he participate in it as in

something that he wishes to bring about, that he seek by his action to make it

---

[11]  *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

[12]  *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000) (abrogated on other grounds).

[13]  D.C. Code § 22-2103 (2012 Repl.).

[14]  *Coleman v. United States*, 948 A.2d 534, 550 (D.C. 2008).

[15]  *See* D.C. Code § 22-1805 (2012 Repl.).

succeed."[16]   Where a particular *mens rea* is an element of the offense, the defendant must have had that *mens rea* himself to be guilty of aiding and abetting that offense.[17]

To prove that Yates encouraged or aided the commission of Hendy's murder with malice aforethought, the government relied primarily on the account of Yates's words and actions provided in the testimony of Kenneth Buchanan and Ebony House, together with the corroboration supplied by Orlando Smith and the security camera footage.  If the jury credited that evidence, as was its prerogative, it could have found Yates aided and abetted Hendy's murder for the following reasons.

First, crediting Buchanan, the jury could have found that he drove Yates along with Walker and Carraway to the scene of Hendy's murder; that Yates asked

---

[16]   *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (internal quotation omitted); *accord Wilson-Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

[17]   *Coleman*, 948 A.2d at 552; *see also Kitt v. United States*, 904 A.2d 348, 356 (D.C. 2006); *Wilson-Bey*, 903 A.2d at 838 ("[I]t is particularly inappropriate to permit the conviction of an aider or abettor upon a lesser showing of criminal intent than is required vis-à-vis a principal when the defendants are being prosecuted for homicide.").

about the ammunition in the car; that Yates was on the lookout for Hendy and pointed out Hendy's van to his companions; that when Buchanan inquired, Yates told him "not to worry" whose van it was; that upon arriving at Southern Avenue Yates helped direct Buchanan where to go; and that Yates then said to Walker and Carraway, "Let's suit up." From this evidence alone, the jury reasonably could infer that Yates encouraged his companions in their venture to find and attack Hendy, expressly associated himself with that venture, and aided the mission by lending his support, helping to locate Hendy, directing Buchanan where to take them, and keeping Buchanan in the dark about their aims.

Second, though Buchanan's testimony by itself permitted the jury to draw the reasonable inference that Yates shared the *mens rea* required to find him guilty of second-degree murder while armed, further powerful evidence of Yates's knowledge and intent was furnished by House. According to her, Walker said that Yates continued to pursue Hendy with him and Carraway *after* Walker said "somebody gonna die today," *after* Walker gave his gun and ammunition to Carraway, *after* Carraway loaded the gun, and *after* the group found Hendy and Carraway declared that he was "about to do it."[18] That Yates demonstrably knew

---

[18] House testified that Walker told her the conversation in which he said "somebody gonna die today" took place on Southern Avenue. If so, Walker

*(continued…)*

his companions planned a murderous attack on Hendy and never withdrew or disassociated himself from it, but instead stayed with them from start to finish, was itself "sufficient to establish implied approval, and hence aiding and abetting."[19]

Third, the evidence of Yates's conduct on Southern Avenue showed that he did not behave like an "innocent bystander."[20] His association there with Walker and Carraway went well beyond mere presence at the scene of the murder to provide concrete aid as well as tacit encouragement. Specifically, the testimony and surveillance footage allowed the jury to find that Yates stalked Hendy with Walker and Carraway; that Yates helped keep Hendy under surveillance and waited with his friends for Hendy to leave the area where his shooting would be

---

*(…continued)*

presumably had not yet made this pronouncement when, in the car on the way to Southern Avenue, Yates pointed out Hendy's van and called upon Walker and Carraway to "suit up" with him. In closing argument, however, the prosecutor urged the jury to infer that Walker actually made the statement earlier, when (per Buchanan) he met up with Yates and Carraway on 10th Place. As we discuss below, Yates and Walker contend that this inference was unwarranted and that the argument was improper. Although we conclude otherwise, we do not rely on the inference urged by the government in our sufficiency analysis.

[19] *Johnson v. United States*, 883 A.2d 135, 143 (D.C. 2005); *see also, e.g.*, *Settles v. United States*, 522 A.2d 348, 358 (D.C. 1987) ("[T]he jury could find that by not availing himself of opportunities to withdraw from the scene, he gave his tacit approval and encouragement to what [the principal actor] was doing.").

[20] *Creek v. United States*, 324 A.2d 688, 689 (D.C. 1974).

caught on camera; that Yates joined Walker and Carraway in pursuing Hendy when he tried to walk away from them; that Yates maintained this pursuit up until Carraway shot Hendy in the back; and that Yates then fled with Walker and Carraway to the safety of Orlando Smith's apartment. The jury readily could infer that Yates's participation not only fortified his accomplices' resolve to proceed with the murder but also helped them to accomplish it by reinforcing their power over Hendy and making it harder for him to defend himself, obtain assistance, or escape.[21]

For these reasons, we hold that the evidence was sufficient to sustain Yates's conviction for second-degree murder while armed.

---

[21] *See Bailey v. United States*, 416 F.2d 1110, 1113-14 (D.C. Cir. 1969) ("Presence is thus equated to aiding and abetting when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed – as when the accused acts as a lookout – or where it stimulates others to render assistance to the criminal act.") (footnotes omitted); *Johnson*, 883 A.2d at 142 (same); *see also Gayden v. United States*, 584 A.2d 578, 583 (D.C. 1990) ("[T]raveling with a principal to the scene of a crime, remaining at the scene during commission of the crime and fleeing with the principal are sufficient facts to underpin a conviction for aiding and abetting.").

## B. Withholding of Exculpatory Evidence

Yates was convicted for having been an accessory after the fact ("AAF") to murder based on the evidence that he sheltered Carraway and helped him hide from the police at his family's home in North Carolina following Hendy's murder. Yates's defense to this charge was that he did not intend to hinder or prevent Carraway's arrest; to the contrary, it was Yates who enabled the police to obtain the arrest warrant for Carraway by identifying him as Hendy's assailant to Detective Cephas.[22] That Yates might have secreted Carraway in North Carolina for a different reason, namely, to protect him from the revenge of Hendy's friends, was indicated, arguably, by the evidence that Yates consulted an attorney, Samuel Hamilton, regarding his concerns about retaliation.

---

[22] AAF is a common-law crime codified in D.C. Code § 22-1806 (2012 Repl.). *See Heard v. United States*, 686 A.2d 1026, 1029-30 (D.C. 1996). "The elements of accessory after the fact to first [or second] degree murder while armed are: (1) that the offense of first [or second] degree murder while armed had been committed, (2) that the defendant knew that this offense had been committed, (3) that, knowing that this offense had been committed, the defendant provided assistance to the person who committed it, and (4) that the defendant did so with the specific intent to hinder or prevent that person's arrest, trial, or punishment." *Jones v. United States*, 716 A.2d 160, 163 (D.C. 1998); *see also United States v. Barlow*, 470 F.2d 1245, 1252-53 (D.C. Cir. 1972) ("The gist of being an accessory after the fact lies essentially in obstructing justice by rendering assistance to hinder or prevent the arrest of the offender after he has committed the crime. Evidence of this offense is most frequently found in acts which harbor, protect and conceal the individual criminal such as by driving him away after he commits a murder.").

Yates asks us to set aside his AAF conviction and grant him a new trial on the charge because, he claims, the prosecution withheld from him evidence materially favorable to his defense to the AAF charge in violation of his right to due process as set forth in *Brady v. Maryland*.[23] Favorable evidence is deemed to be withheld if the prosecution fails to disclose it "in time for the defense to be able to use it effectively, not only in the presentation of its case, but also in its trial preparation."[24] For this reason, deferring the disclosure of *Brady* evidence until the trial is under way or about to start is risky at best and "is not compatible with the Constitution, with our case law, or with applicable professional standards."[25]

Favorable evidence is material within the meaning of *Brady* if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[26] The defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

[23] 373 U.S. 83, 87 (1968).

[24] *Miller v. United States*, 14 A.3d 1094, 1111 (D.C. 2011).

[25] *Id.* at 1108.

[26] *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

proceeding would have been different"[27]; and "where disclosure was made but made late, the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result and not just that the evidence was material."[28]

"[W]hether a defendant has established a violation by the government of its obligations under *Brady* presents a mixed question of fact and law."[29] We review the trial court's factual conclusions under the clearly erroneous standard, but we review legal conclusions *de novo*.[30] Materiality "is, in the end, a legal conclusion."[31]

---

[27] *Turner v. United States*, 116 A.3d 894, 913 (D.C. 2015), *aff'd*, 137 S. Ct. 1885 (2017) (quoting *Miller*, 14 A.3d at 1115, and *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

[28] *United States v. Andrews*, 532 F.3d 900, 907 (D.C. Cir. 2008) (internal quotation marks omitted); *see also, e.g.*, *Zanders v. United States*, 999 A.2d 149, 164 (D.C. 2010) ("Notwithstanding the incomplete and late disclosures in this case, we must conclude that reversal is not warranted because appellant has not met his burden of demonstrating that there was a reasonable probability that, had the evidence been disclosed earlier, the result of the proceeding would have been different.") (internal brackets and quotation marks omitted).

[29] *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011) (internal quotation marks omitted).

[30] *Id.*

[31] *Turner*, 116 A.3d at 915.

The evidence that Yates claims the government withheld was grand jury testimony in which (1) Ebony House said Walker told her the person who drove Carraway to North Carolina was someone other than Yates, and (2) Carraway's mother said she heard Yates urge Carraway to surrender to the police.

### 1. Ebony House's Grand Jury Testimony

The night before House testified at trial, the government provided her grand jury testimony to the defense in compliance with its obligation under the *Jencks* Act and Criminal Rule 26.2 to turn over statements of its witnesses.[32] The next morning, Yates moved for a dismissal with prejudice or, alternatively, a mistrial based on the government's untimely disclosure of *Brady* evidence. House testified in the grand jury that she had asked Walker how Carraway got down to North Carolina, and that Walker said a friend of his who lived there picked Carraway up in Virginia and drove him down. House testified that she did not know the friend's name. Yates argued that this testimony had been disclosed too late for him to investigate or make effective use of it at trial, and that it was materially

---

[32] *See* Super. Ct. Crim. R. 26.2; 18 U.S.C. § 3500 (2017). "Disclosure in accordance with the *Jencks* Act . . . is not seasonable disclosure as required by *Brady*." *Miller*, 14 A.3d at 1114.

exculpatory because it conflicted with the prosecution's theory, as set forth in the government's opening statement, that Yates himself drove Carraway to North Carolina.[33] In response, the prosecutor stated that the government would not introduce any evidence as to who actually drove the vehicle in which Carraway traveled to North Carolina, and that Yates's AAF liability was based simply on the evidence of his having sheltered Carraway from the police in North Carolina regardless of who drove Carraway there.[34] The prosecutor added that the government had no information as to the identity of the friend Walker mentioned to House.

After further discussions with the trial court, and with the permission of Walker's defense counsel, Yates's counsel was able to interview Walker himself about who drove Carraway to North Carolina. Yates's counsel reported back to the court that Walker was "not helpful" – he said he did not know who went with

---

[33] In her opening statement, the prosecutor said, "And knowing that the police were hot on Meeko Carraway's trail, Walker and Yates drove him to North Carolina to help him escape capture."

[34] The AAF count of the indictment did not charge Yates with having driven Carraway to North Carolina, but rather with having assisted him to evade arrest "by . . . traveling to and staying in North Carolina . . . ."

Carraway to North Carolina.[35]   The court then asked the prosecutor to disclose what Carraway, who did not testify at trial, had said about how he got to North Carolina when the government debriefed him in connection with his guilty plea. Reading out loud from her notes of the debriefing, the prosecutor reported that Carraway said he and Yates stole a blue van from Maryland in which Yates drove him to North Carolina.[36]

Apart from its opening statement, the government presented no evidence or argument that Yates personally drove Carraway to North Carolina.   Even after having received House's grand jury testimony, Yates did not ask her at trial to repeat what Walker told her about the identity of the driver.[37]   At the hearing on Yates's new trial motion a few months later, his counsel explained that he did not

---

[35]   Walker denied going to North Carolina himself; nor would he say Yates did *not* accompany Carraway.

[36]   In addition, as the government disclosed at the subsequent hearing on Yates's new trial motion, Carraway's mother testified in the grand jury that Carraway told her "Jack [Walker] and Corey [Yates] took him to North Carolina, where he stayed at Corey's grandmother's house" following Hendy's murder.

[37]   Walker's statement to House about the driver was hearsay, and whether it would have been admissible in evidence at trial is not clear to us. Although much of what Walker told House was admitted under the exception for statements against penal interest, the parties have not addressed whether this particular statement fell within that exception.

seek to elicit testimony at trial from House about Walker's statement because of concern that the jury would "penalize" the defense for raising expectations it then could not satisfy with proof that the "mysterious third party" actually existed.[38]

The trial court denied Yates's *Brady* motion for lack of reason to believe the government's delay in disclosing House's grand jury testimony had resulted in the suppression of any material evidence. In reaffirming this ruling when it ruled on Yates's motion for a new trial, that court noted that even with the additional time to investigate, Yates still had no evidence substantiating the existence of "this third party" who might have been the driver.

Even if Walker's statement itself was inadmissible, it potentially might have led to the discovery of admissible evidence verifying it. On the premise that such theoretically obtainable evidence could have been at least somewhat favorable to Yates's defense, we agree with Yates that the government should not have waited until trial to reveal it to him.[39] Nevertheless, we agree with the trial court that the

---

[38] The government suggests that Yates's failure to ask House about Walker's statement regarding the driver is a strong indication that the statement was immaterial.

[39] *See Turner*, 116 A.3d at 921 n.76; *see also Ellsworth v. Warden, N.H. State Prison*, 333 F.3d 1, 5 (1st Cir. 2003) ("The circuits are split on whether a
*(continued…)*

belated disclosure did not result in a *Brady* violation, for Yates has not met his burden of showing a reasonable probability that earlier revelation of the information would have resulted in a different verdict.

So far as appears, Walker's statement about the driver could not be verified or even corroborated; instead, Yates learned that Carraway flatly contradicted it and Walker himself recanted it (assuming he actually did say it in the first place, as House reported).[40]  Yates's counsel argued to the trial court that if he had received the information earlier, he would have subpoenaed phone records or traveled to North Carolina to identify the driver.  But as the trial court pointed out, Yates had the opportunity to pursue such investigation in the months following the jury's verdict, and he still could not proffer that it would have generated evidence helpful to him at trial.  To this day, Yates has "identif[ied] no evidence that [he] was

---

*(…continued)*
petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible.  Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence. . . .  [G]iven the policy underlying *Brady*, we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it.") (emphasis in original).

[40]  *Cf. Zanders*, 999 A.2d at 164 (finding no *Brady* violation in late disclosure of witness's exculpatory statement to police where the statement was uncorroborated and the witness "completely recanted" it).

unable to present or any argument that he was precluded from making as a result of the tardy disclosure."[41] There is thus no reason to think earlier disclosure of Walker's statement would have enabled Yates to obtain evidence that could have helped him at trial. The "mere speculation that earlier [investigation] might have led the defense to discovery of additional exculpatory evidence is insufficient to establish a *Brady* violation."[42]

Furthermore, the information that someone other than Yates drove Carraway to North Carolina would not, by itself, have been materially exculpatory because it would not have undermined the evidence on which the government actually relied to prove that Yates helped Carraway evade arrest by hiding out in North Carolina. The government presented the uncontradicted testimony of Kathleen Wade and Shamel Prude – testimony the trial court at the post-trial hearing described as "very, very powerful," "extremely powerful," and "extremely credible" – that Yates did in fact go with Carraway and Walker to his family's home in Seaboard, North Carolina on September 29, 2010. In other words, regardless of who did the driving, the government proved that Yates was along for the ride. Even if he had

---

[41] *United States v. Straker*, 800 F.3d 570, 605 (D.C. Cir. 2015).

[42] *Mackabee*, 29 A.3d at 961 (citing *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)).

presented evidence that someone else drove Carraway to North Carolina, therefore, we see no reasonable probability that it would have changed the outcome of the trial. We are confident the jury still would have convicted Yates of being an accessory after the fact to murder.

## 2. W-10's Grand Jury Testimony

After trial, the government informed Yates about the grand jury testimony of "W-10," who was Carraway's mother, and who had not been a witness at trial. In the grand jury, W-10 testified to having overheard Yates urge Carraway to surrender to the police. The government provided the following information:

> On June 24, 2011, W-10 testified in the grand jury that on October 12, 2010, Carraway came to W-10's place of work to speak with W-10. W-10 told Carraway they should talk outside. When they stepped outside, W-10 saw Walker and Yates. They were in a van . . . . Carraway told W-10 that Carraway was in some trouble and was going to turn himself in (ostensibly to police) but would not tell W-10 any details. Walker was quiet and appeared to be rushing Carraway. Yates appeared agitated and also rushing. Yates kept saying, "We need to go, if you're going to do this, you need to go now before you decide not to do it. You said you were going to turn yourself in today, let's go."[43]

---

[43] In its transmittal letter, the government explained that it "came across" this information in the course of reviewing its files in response to Yates's motion

*(continued…)*

At the hearing on Yates's new trial motion, the government disclosed W-10's additional grand jury testimony that after this conversation about Carraway's turning himself in, W-10 called Yates and asked him what her son was turning himself in for.[44] According to W-10, Yates said, "Ma, I don't want to talk about it over the phone; I'll meet you at the house," but then he never showed up and she never saw him again.[45]

Yates argued that the government's failure to disclose W-10's grand jury testimony before trial violated *Brady* because her testimony showed that his intent was not to shield Carraway from arrest but rather to encourage him to surrender.

---

*(…continued)*
for a new trial and was disclosing it "in an abundance of caution" because it recognized that Yates might seek to rely on W-10's grand jury testimony to "demonstrate his lack of intent to help Carraway evade arrest on September 30, 2010." The letter went on to explain that the government did not consider the nondisclosure of W-10's testimony to be a *Brady* violation, because the information was not unknown to appellant and because there was no reasonable probability that it would have altered the verdict. In support of the latter reason, the letter cited the fact that "[t]he jury convicted Yates of accessory-after-the-fact even though he put on evidence designed to show that he wanted to cooperate with police after the murder."

[44] As previously mentioned, Carraway did, in fact, turn himself in to the police on October 12, 2010.

[45] W-10 explained that although she was not Yates's mother, he called her "Ma" because of their close relationship.

The trial court acknowledged that W-10's testimony might have been admissible for this purpose but disagreed that there had been a *Brady* due process violation for two reasons: First, because W-10 was with Yates when he urged Carraway to turn himself in, Yates already knew she could testify to that fact, so the government did not suppress her favorable evidence. Second, even if Yates had presented W-10's testimony at trial, the court was "absolutely convinced" there was no reasonable probability that it would have changed the outcome of the trial.

We agree with the first reason and find it unnecessary to address the second. It is well-settled that "*Brady* only requires disclosure of information unknown to the defendant."[46] Thus, "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence,

---

[46] *United States v. Derr*, 990 F.2d 1330, 1335 (D.C. Cir. 1993), *overruled on other grounds by United States v. Bailey*, 36 F.3d 106 (D.C. Cir. 1994) (citing *Agurs*, 427 U.S. at 103 ); *see also, e.g.*, *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001) ("The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue."); *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence. As a result, the Government is not required to disclose grand jury testimony to a defendant who is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish.") (internal citations and quotation marks omitted).

he can obtain himself."[47]  Yates does not claim to have been unaware that W-10 was present and heard him urge Carraway to surrender, nor does he claim to have been unable to secure W-10's testimony to that effect at trial.  The only thing Yates claims not to have known is that W-10 told the grand jury what he already knew she could say.  But as Yates's ignorance of the government's possession of W-10's grand jury testimony did not prevent him from presenting the same exculpatory information from the same witness at trial, we fail to perceive a *Brady* violation in the nondisclosure.

### C. Rulings on the Admission of Evidence

### 1.  The Admission Against Yates of Walker's Statements to House Under the Hearsay Exception for Declarations Against Penal Interest

Over Yates's objection, the trial court allowed Ebony House to testify to what Walker told her about Hendy's murder.  Yates contends the court erred in finding that the inculpatory statements House attributed to Walker were admissible under the declaration-against-penal-interest exception to the rule against hearsay.

---

[47]  *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) (quoting *United States v. Campagnuolo*, 592 F.2d 852, 861 (5th Cir. 1979)).

To determine whether a statement fits within the exception for declarations against penal interest, a trial court must "undertake a three-step inquiry to ascertain (1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement."[48] Yates concedes that Walker, the declarant in this case, was unavailable to testify,[49] but he asserts that the court could not properly find the other requirements to have been met.

In determining whether a declarant in fact made the declaration claimed to be against his penal interest (the first step of the inquiry), the trial court must "focus . . . on the veracity of the witness who repeats the declaration" and consider, where appropriate, the witness's "general credibility" and any "interest, bias, and . . . possible motive for fabrication."[50] In determining whether the declaration is

---

[48] *Laumer v. United States*, 409 A.2d 190, 199 (D.C. 1979) (en banc).

[49] *See Thomas v. United States*, 978 A.2d 1211, 1228 n.42 (D.C. 2009) ("[I]f the declarant is a co-defendant in a criminal trial in which the government seeks to introduce his statement in its case-in-chief, the unavailability requirement is satisfied because the government cannot call him to the witness stand, even though the co-defendant might later elect to testify in his defense.").

[50] *Laumer*, 409 A.2d at 199. *Laumer*'s requirement that the trial judge assess the credibility of the witness reporting an out-of-court declaration against penal interest has been questioned on the ground that witness credibility is presumptively for the jury to determine, but we have held that it "remains good

*(continued…)*

trustworthy (the third step), relevant considerations include: "(1) the timing of the declaration; (2) to whom the statement was made; (3) the existence of corroborating evidence in the case; and (4) the extent to which the declaration is really against the declarant's interest."[51] Although the conclusion that a statement is against the declarant's penal interest is "clearly a legal question,"[52] whether the declaration in fact was made and whether it is trustworthy are otherwise essentially factual determinations to which a reviewing court must defer unless they are clearly erroneous.[53] "The 'clearly erroneous' standard precludes the appellate court from setting aside a trial court's finding of fact unless the 'judgment is plainly wrong or without evidence to support it.'"[54]

As to the first step of the inquiry, while Yates admits Walker spoke to House, he disputes that Walker in fact told her many of the specific incriminating

_____

*(…continued)*

law" in this jurisdiction. *McCorkle v. United States*, 100 A.3d 116, 122 (D.C. 2014).

[51] *Ingram v. United States*, 976 A.2d 180, 188 (D.C. 2009) (internal quotation marks omitted); *see also Laumer*, 409 A.2d at 200-03.

[52] *Laumer*, 409 A.2d at 203.

[53] *See id.*; *see also Ingram*, 976 A.2d at 187.

[54] *Davis v. United States*, 564 A.2d 31, 35 (D.C. 1989) (en banc) (quoting D.C. Code § 17-305 (a)).

details to which she testified at trial. Yates notes that House did not initially tell law enforcement about such details as Walker's "somebody gonna die today" remark to Yates and Carraway. He claims House embellished her account of Walker's statement because the government threatened her with a perjury prosecution for withholding information from the grand jury, and because she admittedly was afraid for her own safety and feared (as she told the grand jury) that "if he [Walker] don't get charged for this stuff, at the end of the day, it will fall back on me." As to the third step of the inquiry, although Yates does not deny that the inculpatory admissions House attributed to Walker were indeed against Walker's penal interest, he challenges their trustworthiness on the grounds that the two-month lapse of time between the shooting and when Walker spoke to House diminished the reliability of his account to her, and that key parts of Walker's statement (for example, the "somebody gonna die today" remark) were not corroborated.

Yates raised concerns about House's credibility and the trustworthiness of Walker's statement in a pretrial motion seeking severance of his trial from that of Walker.[55] He did not request specific findings on those issues, though, and the trial

---

[55] In connection with that motion, however, Yates mainly argued that Walker's references to him were not really against Walker's penal interest (and

*(continued…)*

court did not make findings with respect to them when it denied severance and ruled that Walker's statement was a declaration against penal interest. Nor, thereafter, did Yates request the court to make findings on House's credibility or the trustworthiness of Walker's statement when the issue came up again at trial and the court permitted House to testify to Walker's admissions.[56] Despite the absence of explicit findings (about which Yates does not complain; he agrees the court made the findings implicitly), we cannot conclude that the court's implicit determinations of House's credibility and the trustworthiness of Walker's inculpatory statements are clearly erroneous.

The implicit determination that House was credible in recounting what Walker told her is not clearly erroneous merely because, as she admitted in her trial testimony, she "didn't tell the whole story" to the grand jury at first. House explained that she was "still with" Walker then, and that she loved him. By the time she testified at trial, the two were no longer dating. When asked then how she

---

*(…continued)*

hence could not be admitted against Yates under the penal interest exception). *See generally Williamson v. United States*, 512 U.S. 594, 599-600 (1994); *Thomas*, 978 A.2d at 1228-29. Yates does not pursue this argument on appeal.

[56] Although Yates preserved his hearsay objection to House's testimony at trial, he declined the court's express invitation to augment his argument against the applicability of the penal interest exception.

felt about him, House testified that "I don't have nothing against him. I don't really too much care. I moved on with my life." As for House's intimation in the grand jury of fear for her safety if Walker did not "get charged for this stuff," she made that statement in explaining why she had not answered Walker truthfully when he asked her what she was telling the grand jury. Given that context, we readily understand why the trial court did not view House's remark as evincing a disqualifying bias or motive to fabricate. As a rule, a trial judge's witness credibility determinations are "virtually unreviewable,"[57] and "[w]e will not redetermine the credibility of witnesses where . . . the trial court had the opportunity to observe their demeanor and form a conclusion."[58] We would not be justified in deviating from that principle of deference here.

We likewise are satisfied that the trial court did not err – and certainly did not clearly err – in finding Walker's account sufficiently corroborated and trustworthy to be admissible under the penal interest exception. It is true that two months passed between the shooting and Walker's account of it to House. We appreciate that statements made months after a crime may be "too attenuated and

---

[57] (*Terri*) *Jenkins v. United States*, 902 A.2d 79, 87 n.12 (D.C. 2006).

[58] *Lazo v. United States*, 54 A.3d 1221, 1230 (D.C. 2012) (internal quotation marks omitted).

remote to provide assurance of reliability."[59]  But "the mere fact that the declaration was made after a lapse of time does not *in and of itself* render the statement unreliable."[60]  In our view, other factors weigh clearly in favor of a finding of overall reliability in this case.  Walker made the statement in private to his girlfriend at the time, someone he evidently trusted to keep his secrets; "[i]n that setting, in contrast to, for example, a custodial interrogation by police, he had no apparent motive to lie, exaggerate, curry favor or shade the truth" about Hendy's shooting.[61]  He unambiguously incriminated himself and two of his closest friends in a premeditated murder, admitting that he supplied the gun and ammunition to commit it.  On the major points, his account was amply corroborated by other evidence at trial – most notably, the testimony of Kenneth Buchanan and Orlando Smith and the surveillance video showing how Walker, Yates, and Carraway tracked Hendy up until the moment of the shooting.  The corroboration was not total – as Yates points out, some important details (such as Walker's admission that he told Yates and Carraway "somebody gonna die today")

---

[59]  *Gilchrist v. United States*, 954 A.2d 1006, 1015 (D.C. 2008) (quoting *Laumer*, 409 A.2d at 201) (upholding the trial court's finding of untrustworthiness where, among other things indicative of unreliability, the declarant's statement was made five years after the murder in question).

[60]  *Laumer*, 409 A.2d at 201 (emphasis in original).

[61]  *Thomas*, 978 A.2d at 1230.

were not corroborated; moreover, Walker's account of meeting up with Yates and Carraway at 800 Southern Avenue was contrary to Buchanan's testimony that they met up at 10th Place. But neither total corroboration nor an absence of conflicting evidence is required. In our view, the lack of confirmation of some details is not enough to detract from the demonstrated overall trustworthiness of Walker's statement, let alone to render the trial court's implicit finding of trustworthiness clearly erroneous.

## 2. The Admission of Buchanan's Understanding of Yates's Remark, "Let's suit up"

Over defense objection, the trial court allowed Buchanan to testify that he understood Yates's remark, "Let's suit up," to convey his intent "to do bodily harm to somebody." Appellants argue that the court abused its discretion in admitting this lay opinion. We do not agree.

The non-expert opinion testimony of a lay witness is admissible in evidence if it is rationally based on the witness's personal observations and would be helpful to the trier of fact in understanding the witness's testimony or a fact in issue.[62] In accordance with that rule, we have held that "[a] lay witness with personal

---

[62] *Gee v. United States*, 54 A.3d 1249, 1261 (D.C. 2012).

knowledge about particular slang properly may testify to its meaning."[63] "[W]hen 'the reasoning process . . . employed to interpret the street language was the everyday process of language acquisition' as opposed to 'special training or scientific or other specialized or professional knowledge,' opinion testimony explaining such language does not veer impermissibly into expert testimony."[64]

The criteria for admission were satisfied here. Buchanan had just taken Walker to obtain handgun ammunition and then to meet up with Yates and Carraway. Yates asked about the bullets, pointed out a van, and refused to tell Buchanan what was going on while Walker stated they were looking for someone. Next, Buchanan heard Yates say, "Let's suit up." It was in light of those observations that Buchanan said he "took it to mean to do bodily harm to somebody." Buchanan did not rely on any special training or knowledge to interpret Yates's utterance in that way; his understanding simply reflected his

---

[63] (*Emanuel*) *Jenkins v. United States*, 80 A.3d 978, 1000 (D.C. 2013) (upholding admission of lay opinion testimony about slang used in jail calls, such as that the phrase "off the water" referred to smoking or being addicted to PCP); *see also King v. United States*, 74 A.3d 678, 680-83 (D.C. 2013) (upholding admission of police officers' lay opinion testimony as to the meaning of "street lingo," such as that "bagging somebody" means "robbing them, getting their stash").

[64] (*Emanuel*) *Jenkins*, 80 A.3d at 1000 (quoting *King*, 74 A.3d at 682-83).

personal familiarity with the slang in the context in which he heard the words spoken. The ominous meaning Buchanan attached to Yates's expression was pertinent to the jury's fact-finding task, for if Buchanan's understanding was correct, the words were indicative of Yates's culpable intent. Moreover, Buchanan's understanding explained his own subsequent actions – why he felt frightened and declared, "Y'all ain't about to do nothing crazy, because if you is, get out the car."

Appellants may be correct that the jury surely understood Yates's remark without Buchanan's interpretation. In closing argument, the prosecutor argued that "there's really only one obvious, common sense thing that 'let's go suit up' could mean under these circumstances[:] Let's go load the gun and let's get to killing." If that meaning of "Let's suit up" was obvious to the jury, Buchanan's explanation was at worst superfluous, but not a reason to reverse appellants' convictions. But even if the remark was susceptible to a more benign interpretation, a trial court's decision to admit lay opinion testimony "will not be overturned unless it constitutes a clear abuse of discretion."[65] The court did not abuse its discretion here.

---

[65] *Gee*, 54 A.3d at 1261 (internal quotation marks omitted).

### 3. Admission of Testimony That Unknown Persons Had Implicated Walker in Hendy's Murder

Walker contends the trial court erred in instructing the jury it could consider hearsay linking him to Hendy's murder, albeit only for a limited, non-hearsay purpose. We conclude that Walker forfeited this claim at trial and has not shown plain error entitling him to relief on appeal.

When Officer Corcoran testified about encountering Walker "straddling the balcony" of an 11th floor apartment during a building-wide search for the suspects in Hendy's shooting, the prosecutor asked him who he was looking for at that time and what description he had been given of that suspect. Without objection, Officer Corcoran testified that he was looking for a suspect named "Kojak" (Walker's nickname) who had been described as "a black male with long hair, medium complected," no shirt, and "800 Southern" tattooed on his chest. The trial court interrupted the testimony and called counsel to the bench. In the ensuing colloquy, though neither Walker nor Yates objected to the testimony, the court ruled that a hearsay description from unknown persons was not admissible as evidence of Walker's complicity in Hendy's murder. The court accordingly barred the

government from eliciting further testimony about the suspect's description or asking Officer Corcoran whether Walker met the description.

The government argued, however, that the hearsay description the jury had heard was admissible for a non-hearsay purpose related to the APO count against Walker for resisting his arrest, namely to show the reasonableness of Officer Corcoran's detention and handcuffing of Walker. Neither Walker nor Yates disagreed with this rationale for limited admission; nor did they at any point ask the court to strike Officer Corcoran's testimony about the suspect's description or instruct the jury to disregard it in its entirety. With appellants' consent, the court therefore instructed the jury that it could consider the description Officer Corcoran had received only in connection with the APO charge as evidence of the reason for the officer's actions, but not as substantive identification evidence with respect to the homicide charge.[66] No party objected to this instruction or questioned its

---

[66] The court gave two limiting instructions. Immediately following its colloquy with counsel about Officer Corcoran's testimony, the court instructed the jury:

> Now, ladies and gentlemen, these descriptions have nothing to do with the shooting. They just are the reasons why the officer was looking for a particular person. So do not use them in any way to say that this – was anybody given the description of the shooter. So strike that part from it. You can say that's the reason that

*(continued…)*

adequacy.   Thereafter, the court allowed Walker's counsel to obtain Officer

---

*(…continued)*

> he's looking for a particular person.  But that does not show when someone says: Well, this person went this way, this person that way.  That should not be used for substance of identification of what happened with regard to the homicide.

At the conclusion of the government's direct examination of Officer Corcoran, the court re-instructed the jury on the matter as follows:

> Ladies and gentlemen, I just want the record to be clear in the case here.  When they say that he was looking for somebody, that information is only given to you to indicate a state of mind why he was doing this.  There is a charge in the indictment of assault on a police officer, resisting arrest.  So that would be a charge that you're going to consider.
>
> But with regard to the homicide charge, and to say people said, "Look for this guy," it has nothing to do with that. Do not use it in that way because those people are not here or anything like that.  That's just somebody they stopped and why he is stopping the person.  That's the extent to use that. Do you all understand that?
>
> [The transcript here states:  "Jury respond in kind."]
>
> All right.  That's the only reason we brought it up.  Other than that it wouldn't be brought up because someone said:  Oh, that guy went there.  That guy went there.  Go look for him.  That's not evidence of itself, that they saw something and they're making identification, because it says why am I there doing this.

In its instructions at the close of trial, the court reminded the jury, "When I've instructed you to consider certain evidence only for limited purpose such as to determine credibility, you may only consider it for that limited purpose."

Corcoran's acknowledgement on cross-examination that the person who provided the suspect's description was "[n]ot [someone] that actually saw him do the shooting." Although this too was hearsay, the court allowed the testimony, over the government's objection, on a curative admissibility rationale. Walker did not request any other remedial measure. Thereafter, the description that Officer Corcoran received was not mentioned again at trial; the prosecutor did not allude to it in the government's closing and rebuttal arguments.

Walker argues that the trial court erred in allowing the jury to consider a hearsay description implicating him in Hendy's murder even though only for a non-hearsay purpose. The admission of this highly damaging evidence served no legitimate purpose, Walker contends, because the reason Officer Corcoran arrested and forcibly restrained him was not relevant or at issue in the trial. The government disagrees. It argues that Officer Corcoran's knowledge of a description justifying his detention and forcible restraint of Walker as a murder suspect was indeed relevant, for non-hearsay reasons, to two components of the APO charge against Walker: (1) whether Walker's conduct was "directed against

an officer's performance in the line of duty,"[67] and (2) whether Officer Corcoran used reasonable rather than excessive force in effectuating Walker's arrest.[68]

Because he did not object at trial to admission of the hearsay description for the non-hearsay purpose of explaining Officer Corcoran's actions, or to the adequacy of the limiting instructions to cabin the jury's consideration of the description to that purpose, Walker's claim of error is subject to "the rigors of plain error review."[69] As this court has said, "[t]he defendant's burden in plain error

[67] *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999). The APO statute in effect at the time of the offenses in this case does not use the words "line of duty"; it is directed at interference with a law enforcement officer "engaged in the performance of his or her official duties." D.C. Code § 22-405 (b) (2012 Repl.). The trial court instructed the jury that, in order to convict of APO, it would have to find Officer Corcoran "was engaged in the performance of his official duty."

[68] The trial court instructed the jury that in deciding whether Walker acted without justification or excuse in resisting Officer Corcoran, it should consider, *inter alia*, whether the officer used more force to restrain him than "appear[ed] reasonably necessary."

[69] *Thomas v. United States*, 914 A.2d 1, 6 (D.C. 2006). If the issue before us were whether the trial court erred by permitting the jury to consider the description for its truth, i.e., despite the court's own expressed recognition that it was inadmissible hearsay, we might agree with Walker that "the appropriate standard of review is harmless error and not plain error" because then "[t]he purpose of the requirement of timely exceptions to trial errors[,] to alert the trial court and give it an opportunity to correct the error," would have been fulfilled regardless of Walker's inaction. *Chatmon v. United States*, 801 A.2d 92, 100 (D.C. 2002). But the court did not permit the jury to consider the description for its truth; it told the jury not to do so.

cases is, and should be, a formidable one; we will reverse a conviction for error not complained of below only in an extreme situation in which the defendant's substantial rights were so clearly prejudiced that the very fairness and integrity of the trial was jeopardized."[70] The defendant must demonstrate not merely that there was an error, but also that the error was clear or obvious – so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object. In addition, the defendant must demonstrate that the error affected his substantial rights by showing a reasonable probability that it had a prejudicial effect on the outcome of his trial. Lastly, even if the defendant succeeds in those demonstrations, he also must show that the error seriously affected the fairness, integrity or public reputation of the judicial proceeding.[71]

It suffices to say that we think Walker has shown neither clear error nor a reasonable probability of prejudice. We take Walker's point that otherwise inadmissible hearsay incriminating a defendant may be admitted to provide the explanation for a police officer's actions only when the officer's actions genuinely

---

[70] *Comford v. United States*, 947 A.2d 1181, 1189 (D.C. 2008) (quoting *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992)).

[71] *Comford,* 947 A.2d at 1189-90 (internal quotation marks and footnotes omitted).

need to be explained – in other words, only when the explanation is relevant to the issues in the case. We would be opening an unacceptably "large loophole in the hearsay rule" if we were to sanction the introduction of evidence "explaining why government agents 'did what they did' through reference to statements of absent informants" without regard for the relevance of that explanation.[72]

Whether the description was legitimately relevant for a non-hearsay purpose in this case is certainly doubtful in our view, but we think we must recognize that the trial court had grounds to think Officer Corcoran's reason for arresting Walker might be relevant at least to the issue of the reasonableness of his use of force. "The trial court enjoys particularly broad discretion in determining the relevance of a piece of evidence because the inquiry is fact-specific and proceeds under a flexible standard."[73] The threshold is low. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the

---

[72] *United States v. Evans*, 216 F.3d 80, 86 (D.C. Cir. 2000) (holding that FBI agent's testimony that the FBI had received information that the defendant was involved in drug trafficking was not admissible for the non-hearsay purpose of explaining why the FBI recruited individuals to cooperate against the defendant).

[73] *Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014); *see also Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010) ("An evidentiary ruling by a trial judge on the relevancy of a particular item is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse.") (internal quotation marks and citations omitted).

determination of the action more probable or less probable than it would be without the evidence.[74] Officer Corcoran's testimony – that he arrested Walker because Walker matched the description of the suspect in Hendy's murder – at least arguably satisfied this undemanding test. The evidence might not have been necessary to prove the APO charge; although the statute does not define the term "official duties," a law enforcement officer engaged in making even an unlawful arrest is deemed as a matter of law to be engaged in the performance of those duties, and the unlawfulness of the arrest by itself does not justify or excuse forcible resistance.[75] But though the argument for relevance strikes us as weak, we think it was not unreasonable for the trial court to conclude that Officer Corcoran's testimony regarding the suspect's description did have some tendency to show the reasonableness of the officer's firm use of force in restraining Walker. This was not an entirely uncontested issue. Walker essentially argued in closing that he was compliant with Officer Corcoran's commands and that the officer used more force than necessary to restrain him and then overreacted to an innocuous movement on

---

[74] *See* Fed. R. Evid. 401; *see also In re L.C.*, 92 A.3d 290, 297 (D.C. 2014).

[75] *See* D.C. Code § 22-405 (d); *Dolson v. United States*, 948 A.2d 1193, 1201 (D.C. 2008); *see also Mattis v. United States*, 995 A.2d 223, 225-27 (D.C. 2010).

his part. We therefore find ourselves unable to say the trial court clearly erred in ruling the description testimony relevant.[76]

In any event, though, we are confident that Walker has shown no reasonable probability that introduction of the description testimony had a prejudicial impact on the outcome of his trial. For one thing, the court gave repeated limiting instructions, and we "presume that a jury follows the court's instructions, absent any indication to the contrary."[77] We have stronger reasons than that, however. The evidence arrayed against Walker at trial to prove he was the instigator and one

---

[76] Walker's primary challenge is to the relevance *vel non* of the description testimony, but to the extent he also argues that the testimony should have been excluded as being substantially more prejudicial than probative (under the policy set forth in Federal Rule of Evidence 403, which this court has adopted), our conclusion on plain error review would be the same. A Rule 403 claim, had it been made in the trial court, would have required the court to assess whether the probative value of the description testimony was *substantially* outweighed by the danger of what we refer to as "unfair prejudice," which "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Comford*, 947 A.2d at 1187 (internal quotation marks omitted). Rule 403 thus "tilts in favor of admitting as much relevant evidence as it is reasonable and fair to include. Under Rule 403, probative evidence should not be excluded because of crabbed notions of relevance or excessive mistrust of juries." *Id.* (internal punctuation and citations omitted).

[77] (*Roscoe*) *Lewis v. United States*, 930 A.2d 1003, 1008 (D.C. 2007). Walker belatedly argues that the court's instructions were flawed and unclear, but he perceived no serious deficiencies in the trial court, and we are satisfied that the jury understood the central point, that it was not to consider the hearsay description as evidence of Walker's involvement in Hendy's shooting.

of the perpetrators of Hendy's shooting was overwhelming wholly without the description testimony. It included not only the testimony of Buchanan, House, and Smith, but also the surveillance video footage taken before and after the shooting, which showed Walker and his two accomplices pursuing Hendy and then, after the shooting, fleeing into the building at 800 Southern Avenue. The jury hardly needed a hearsay description of the suspects to know that Walker was one of them.

## D. The Government's Closing Argument

Appellants' final claim is that the prosecutor prejudicially misstated the evidence in the government's initial closing argument. The comments at issue concerned when and where Walker declared to Yates and Carraway that he and House had broken up, his two friends were "all I got," and "somebody gonna die today." The prosecutor argued to the jury that Walker must have delivered this "somebody gonna die today" speech when the three men conversed out of Buchanan's hearing in the alley on 10th Place, *before* Buchanan drove them to 800 Southern Avenue – and thus *before* Yates pointed to Hendy's van and said, "Let's suit up." Appellants claim this was a misstatement of the evidence because the only evidence of Walker's "somebody gonna die today" remark was provided by Ebony House, and she testified that Walker told her he said it at 800 Southern

Avenue, *after* Buchanan dropped him off there – and thus *after* Yates allegedly called attention to Hendy's van and called upon Walker and Carraway to "suit up."

The trial court overruled Yates's objection to the prosecutor's argument. It concluded that the jury fairly could reconcile Buchanan and House's conflicting accounts by inferring that they had testified to the same conversation and that it occurred on 10th Place. The court considered this to be a reasonable inference from the evidence. We agree with the trial court.

"It is improper for an attorney to make an argument to the jury based on facts not in evidence or not reasonably inferable from the evidence."[78] Inferences must have a "foundation in the record."[79] But the converse also holds: "In closing argument, a prosecutor may make 'reasonable comments on the evidence and may draw inferences that support the government's theory of the case' so long as those

---

[78] *Morrison v. United States*, 547 A.2d 996, 999 (D.C. 1988); *see also, e.g.*, *Anthony v. United States*, 935 A.2d 275, 284 (D.C. 2007) ("It is incumbent upon the prosecutor to take care to *ensure* that statements made in opening and closing arguments are supported by evidence introduced at trial.") (emphasis in original; internal quotation marks omitted).

[79] (*Rodney*) *Jenkins v. United States*, 80 A.3d 978, 1001 (D.C. 2013).

inferences are not 'unsupported by the evidence.' This is so even though the evidence may be ambiguous."[80]

The prosecutor in the present case did not simply assert her conclusion that the "somebody gonna die today" conversation occurred on 10th Place. She explained to the jury why the evidence reasonably supported that conclusion. She argued that "[c]ommon sense . . . tells you that's what the conversation was about" because "[t]he only way to make sense of what happened . . . after that . . . [in the] four-minute drive from Corey Yates's house to the high-rise . . . is if the conversation occurred at that time." In particular, the prosecutor argued, this timing explained why Yates and Walker both pointed out Hendy's van, "[b]ecause the only reason that van could have been significant to them at that time and in that moment was because they both realized they had just found someone suitable to kill. They had just found the target for Walker's rage."[81]

---

[80] *Id.* (quoting (*Rodney*) *Lewis v. United States*, 996 A.2d 824, 832 (D.C. 2010)).

[81] The entire portion of the government's argument addressing the timing of Walker's "somebody gonna die today" statement was transcribed as follows:

> Mr. Buchanan or Uncle Poochie tells you that after he arrived with Walker at [house address omitted] 10th Place, SE. Walker got out of the car and went over to the side of the house where Yates and Carraway were

*(continued…)*

*(…continued)*

standing and he had a conversation with them. A conversation that Mr. Buchanan could not hear. But you know what that conversation was about because Ebony House explained to you what Walker told her he said to Corey Yates and Meeko Carraway when he met up with them.

He told them about what had happened with Ebony. He told them that his relationship with Ebony had ended, that they were all he had left in the world and that somebody had to die that day.

Common sense also tells you that that's what the conversation was about. Because the only way to make sense of what happened in the four minutes after that, because it's just a four minute drive from Corey Yates' house to the high-rise. The only way to make sense of what happened after that, is if that conversation occurred at that time. Because as they got – when they got back in the car, what Yates was talking about where [sic] the .9 millimeter jackets that were sitting next to him on the seat. And as they passed Darrel Hendy's van in the parking lot, Walker told Buchanan to slow down so they can get a good look and make sure that really was Darrel Hendy's van. And you know it was Darrel Hendy's van, ladies and gentlemen[,] because you've seen the pictures of where it was parked. And you know it was visible as they approached the high-rise and as they drove past it. . . .

And as they passed that van, Yates and Walker, both said "There's the van, there it is right there." And that's a really important fact, ladies and gentlemen. Because the only reason that van could have been significant to them at that time and in that moment was because they both realized they had just found someone suitable to kill. They had just found the target for Walker's rage. They

*(continued…)*

Three things should be noted about this argumentation. First, the prosecutor did not misstate any testimony – she did not claim, for example, that any witness actually had said that the "somebody gonna die today" conversation took place on 10th Place. Rather, the prosecutor acknowledged that to be an inference from other testimony. Second, by making the chain of inference clear, the prosecutor enabled the jurors to evaluate its persuasiveness and decide rationally for themselves whether they agreed with her conclusion. The prosecutor did not ask the jury to just rely on her say-so. Third, by exposing her reasoning as and when she did, the prosecutor enabled defense counsel to respond to it, identify its weaknesses, and defend an alternative conclusion from the evidence as to the time and place of the conversation at issue. This is how closing argument is meant to work.

In our view, moreover, the prosecutor's inference was a reasonable one. Both Buchanan and House testified about a conversation that Walker had with

---

*(…continued)*

> had just found the target that would allow Corey Yates to show what a true and loyal friend and servant he was to Chamontae Walker. And in case you have any doubt about what Corey Yates' intentions were when he said, "There's the van." He made them abundantly clear when moments later he said, "Let's go suit up."

Yates and Carraway on September 25, 2010. The evidence provided several reasons to conclude they were talking about the same conversation and that it took place when Buchanan said it did. First, both Buchanan and House described the conversation as occurring when and where the three men met. Although House said Walker told her their meeting was at 800 Southern Avenue, the jury reasonably could conclude she was confused or misinformed about that fact after it heard Buchanan's conflicting testimony that he was present when Walker met Yates and Carraway on 10th Place and that he personally drove all three from there to Southern Avenue.[82] Second, Buchanan overheard Walker complain about House, which was consistent with House's testimony that Walker told Yates and Carraway about their breakup. Third, Buchanan said the three men walked away from him to confer out of his earshot; that behavior was understandable if they were having the disturbing conversation House recounted, in which Walker openly declared that "somebody gonna die today." And fourth, as the prosecutor emphasized, what Buchanan said the three men did in his car immediately

---

[82] In rebuttal, the prosecutor plausibly argued that when Walker spoke to House, his concern was to tell her how he caused Carraway to shoot Hendy, not to enumerate "every minute detail of what happen[ed]," so "[t]he fact that Walker doesn't tell Ms. House that he drove to 10th Place where he picked up Yates and Carraway doesn't mean it didn't happen; he just isn't going through every single stop that he made."

following their encounter on 10th Place was plausibly explained by their just having had the conversation House described.

We conclude that the prosecutor did not misstate the evidence and that her argument was rationally grounded in the record.

**III.**

For the foregoing reasons, we affirm appellants' convictions.