**Reginald HILL, a/k/a Ronald Johnson, and Eddie B. Ellis, Jr., Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 93–CF–160, 93–CF–336.**

District of Columbia Court of Appeals.

Argued Oct. 19, 1994.

Decided Aug. 31, 1995.

Eli Gottesdiener, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, were on the brief, for appellant Ellis.

William T. Morrison filed a brief for appellant Hill.

Stacey L. Sovereign, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Leslie Ann Gerardo, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

On towards midnight of the evening of December 20, 1991, appellants Reginald Hill and Eddie Ellis killed one man and wounded another in a street confrontation near Columbia Road and 14th Street, N.W. Several

hours later, at approximately 3:00 a.m., the police, without a warrant but through a ruse, entered the apartment of a female acquaintance of appellants, Katrina Harrell, and seized both appellants. The principal issue on appeal is whether the trial court correctly ruled that the appellants lacked standing to challenge the warrantless entry into the apartment.[1] We affirm.

## I.

At the suppression hearing, the government introduced evidence of the post-shooting events that led to the police entry. Shortly after the shooting, the wounded man and an eyewitness gave police officers a rather detailed description of the two assailants, and the eyewitness further identified them as "Reggie" and "Eric." Sometime thereafter, slightly before 3 a.m., a male caller, who remained anonymous, identified the assailants as "Reggie" and "Eddie" and stated that he had just seen them enter apartment 514 at 1400 Fairmont Street. Several detectives thereupon left to visit that address.

In a seemingly unrelated incident, at approximately 2:40 a.m., Katrina Harrell, a resident of apartment 514 at 1400 Fairmont Street, phoned police, complaining that there was a man outside her apartment with a gun. Officers Hill and Hines responded to the call, but found no one outside of Harrell's apartment. They knocked on the door, and Harrell let them in. Officer Hill testified that Harrell told him that the person outside of her door earlier was John Brown and that he hung out in apartment 318. Officer Hill noticed that there was a man, who was holding a baby, and two other women (besides Harrell) in the apartment.

Officer Hill testified that he spoke with John Brown outside of apartment 318 and Brown told them "[t]here are two dudes in that apartment [referring to apartment 514] that killed my best friend tonight." Brown said that the incident had occurred at the corner of Fourteenth Street and Columbia Road. The officers then escorted Brown out of the building without incident. Officer Hill testified that he returned to Harrell's apartment to inform her of Brown's departure and that he saw the same people in the apartment.

When the group of detectives investigating the homicide arrived at the address, they encountered Officers Hines and Hill, who related the events following Harrell's telephone call. Officer Hill gave a description of the male that he had seen in Harrell's apartment, to which one of the detectives responded, "That's him, that's the shooter."

Officers Hill and Hines, accompanied by several detectives, thereupon returned to Harrell's apartment. In response to a knock, Harrell asked who was at the door, and Officer Hill identified himself and said that he had forgotten to ask her something. She opened the door, and Officer Hill entered, followed by the others.[2]

Once in the apartment, the officers approached the man who was still sitting on the couch (who was later identified as appellant Ellis) and frisked him. The officers asked Harrell if anyone else was in the apartment (the other two women were still in the front room). Harrell said yes, and led them to the back room, where appellant Hill was lying on a bed, wearing street clothes (including his shoes) and pretending to be asleep. Appellants matched the previous descriptions of the assailants,[3] and Ellis identified himself as "Eddie"; Hill said his name was "Ronald Johnson," but the women in the apartment identified him as "Reggie." The appellants were then placed under arrest.

1. Appellants sought to suppress subsequent identifications made by eyewitnesses to the shootings and certain post-arrest statements. Appellants were convicted of voluntary manslaughter while armed, D.C.Code §§ 22–2405, –3202 (1989 Repl. & 1995 Supp.), assault with a dangerous weapon, D.C.Code § 22–502 (1989 Repl.), and related weapons charges.

2. Later in the hearing, Harrell testified that she was unaware that there were other officers (besides Officer Hill) outside her door and that she did not consent to the officers' entry.

3. In particular, Ellis was light-complected, while Hill was dark-complected, which matched the description of the assailants given by one of the eyewitnesses. That eyewitness also described Ellis as "short"; Officer Hill testified that Ellis was 5'7" or 5'8". Finally, witnesses said that the dark-complected assailant was wearing an earring, as Hill was wearing.

Ellis's attorney then called Harrell as a witness. Defense counsel asked her, "on December 20th and 21st, 1991, who lived in your apartment apart from you on a permanent basis?" Harrell replied "Reggie and Eddie. They was like staying there, not really leaving [living?] but they were staying." After further questioning, however, she indicated that only her children stayed with her every day, and when asked by defense counsel who was staying with her "on a less than permanent basis from time to time," she replied "Larissa Carr, sometimes Reggie and sometimes Eddie." She also testified that the appellants were staying with her the night of the 20th through the 21st of December, and that they had stayed with her the previous night (*i.e.,* the night of the 19th). She further testified that when the police entered, Ellis was on the couch holding one of her twin daughters and that Hill was awake in the back room, watching television.

On cross-examination, Harrell acknowledged that Ellis was living with his grandmother. She further testified:

> [Ellis] was just spending the night down [at] my house, you know. He wasn't living with me, they would just spend the night sometimes.

The court repeated "Sometimes," and the witness replied "Uh-huh." The government then asked about Harrell's relationship with Ellis:

> [PROSECUTOR]: Was Eddie your boyfriend?
>
> [HARRELL]: Something like that, not really.
>
> THE COURT: Something like that.
>
> [HARRELL]: We were good friends.

At the close of the hearing, the trial court found that the appellants lacked standing to challenge the search of Harrell's apartment under the Fourth Amendment. The trial court found several facts[4] that led to the conclusion that the appellants were not overnight guests and therefore did not have standing. First, the appellants had just entered the apartment minutes before the police arrived at approximately 3 a.m. The trial court also stated that it "totally disbelieve[d]" Harrell's testimony that the appellants were overnight guests on the night in question. Moreover, the court found that Hill was not in the room in which he would have been sleeping had he been spending the night, and that he was feigning sleep while fully dressed and still wearing his shoes. Finally, the court noted that both appellants lived nearby. The trial court therefore concluded that appellants did not have standing:

> [T]hese two individuals had no standing because ... they did not meet their burden of proof that they were overnight guests within the meaning of Minnesota versus Olson.

## II.

Before turning to the merits, we address appellants' claim that the trial court erred in declining to admit Harrell's grand jury testimony when the defense attempted to introduce it after she had testified at the suppression hearing. That grand jury testimony was considerably more expansive on the frequency and duration of appellants' overnight stays at the apartment and on the relationship of appellant Hill to Larissa Carr, who sometimes lived in the apartment with Harrell. As we read the suppression hearing transcript, appellants' theory of admission was that of a prior consistent statement, and the trial court ruled on that basis.

■■■ Our review of this issue is limited, for "[t]he trial judge has broad discretion with respect to the admission or exclusion of prior consistent statements." *District of Columbia v. Bethel,* 567 A.2d 1331, 1336 (D.C. 1990). Moreover, "[o]rdinarily, prior out-of-court statements consistent with a witness's trial testimony are inadmissible in a criminal prosecution on the theory that repetition does not imply veracity." *Prophet v. United States,* 602 A.2d 1087, 1093 (D.C.1992). As

---

4. Additionally, "[i]n reviewing that denial of appellant's suppression motion, we consider both the evidence offered at the suppression hearing and the undisputed trial testimony." *Rose v. United States,* 629 A.2d 526, 528 n. 2 (D.C.1993).

At trial, Ellis testified that he went to Harrell's to get his key from Hill, and not to spend the night. Ellis further testified that he had told the police the same thing shortly after he was arrested.

we further explained in that case, "[a]n exception to this rule permits the introduction of a prior consistent statement to rehabilitate a witness whose credibility has been undermined by a specific suggestion of fabrication or of a motive to lie." *Id.* (quotation marks omitted). However, "[w]hen used for a rehabilitative purpose, a prior consistent statement must be directed only at the particular impeachment that occurred and must support the particular testimony that has been impeached. Finally, the statement must have been made at a time when, considering all the circumstances, the witness did not have a motive to fabricate." *Id.* (citations omitted); *see also Mitchell v. United States,* 609 A.2d 1099, 1110 n. 20 (D.C.1992) ("Prior consistent statements are inadmissible except to meet the force of impeachment and to rebut a charge of recent fabrication.").

We see no basis to find an abuse here by the trial court of its broad discretion, particularly where it itself was the finder of fact. Although the government had attempted to impeach Harrell's testimony by alleging she was biased because of her friendship with Ellis, her prior consistent statement would not tend to show that she was unbiased, but only that she had previously testified in the same way.[5] The trial court noted that its assessment of Harrell's veracity would not be swayed by the fact that Harrell had previously testified consistently with her suppression hearing testimony. Specifically, the court found that "if she wanted to lie about it, she could have lied back then just like now." He later remarked, "If I let it in, it would still be up to me as to whether to believe or disbelieve whatever the testimony is here or at the grand jury."[6] *See Williams v. United States,* 595 A.2d 1003, 1006 (D.C.1991) ("Assessing the credibility of witnesses is uniquely a trial court's function, and we will reverse only if we find those assessments plainly wrong or lacking evidentiary support.").

No other cogent theory of admission appears to have been presented to the trial court or on appeal. In any event, if the defense was attempting to introduce her prior testimony as additional substantive evidence,[7] there seemed to be no compelling reason for the trial court to admit the transcript since Harrell had just testified. While she was on the stand, the defense could have elicited from her any testimony that she gave before the grand jury. Furthermore, had the trial court accepted the transcript at the time it was proffered, after Harrell had been excused as a witness, the government would have had no opportunity to cross-examine Harrell about that prior testimony relevant to the standing issue.[8]

5. The appellants argue that the trial court misunderstood Harrell's testimony (both before the grand jury and at the suppression hearing) as providing appellants with an alibi. We note that even assuming this to be true, the court did not base its decision to refuse to receive Harrell's grand jury testimony into evidence on this ground, but rather properly applied the evidentiary principles regarding prior consistent statements, as articulated here.

6. Appellants at this point had argued that the grand jury testimony had been given at a time when standing had not become an issue.

7. *Cf.* IV WIGMORE ON EVIDENCE, § 1132, at 294 (1972) ("The consistent statements are not to be taken in themselves as additional testimony."); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 1.11 (4th ed. 1993) (if the jury "find[s] that the earlier statement is consistent with the witness' present testimony in court," the jury "may consider this consistency in judging the credibility of the witness here at trial, but not as proof that what was said in the earlier statement was true" (internal punctuation omitted)).

In this jurisdiction, at the time of trial, even prior *inconsistent* statements were not admissible as substantive evidence but only to contest credibility. *See Brewer v. United States,* 609 A.2d 1140, 1141 (D.C.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1019, 122 L.Ed.2d 166 (1993); *cf.* FED.R.EVID. 801(d)(1). By amendment of D.C.Code § 14–102 in late 1994, *see* 42 D.C.Reg. 20, 22 (Dec. 27, 1994), prior statements in certain circumstances are now admissible as substantive evidence.

8. Although the government had the opportunity to examine Harrell at the grand jury hearing itself, at that time it may have had different motives in mind (most specifically, eliciting sufficient evidence to bring appellants to trial) and not have been focused on the collateral issue of appellants' standing to challenge the search. *Cf. Skyers v. United States,* 619 A.2d 931, 933–34 (D.C.1993) (outlining the factors for admission of prior recorded testimony of an unavailable witness).

Since the trial court did not err in refusing to admit Harrell's grand jury testimony, we evaluate appellants' claim of standing based on the evidence presented at the suppression hearing. We now turn to that issue.

### III.

■ Appellants here bore the burden of proof on the issue of standing: "the person claiming the protections of the Fourth Amendment[ ] ha[s] the burden of proving 'that he had a legitimate expectation of privacy'" in the area in question. *Bryant v. United States,* 599 A.2d 1107, 1109 (D.C. 1991) (quoting *Rawlings v. Kentucky,* 448 U.S. 98, 104–05, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980)). "'In order to prevail on a motion to suppress, the movant must establish both that he had a legitimate expectation of privacy in the area searched, and that, in fact, the search was illegal.'" *Lewis v. United States,* 594 A.2d 542, 545 (D.C. 1991) (quoting *Moore v. United States,* 468 A.2d 1342, 1345 (D.C.1983)), *cert. denied,* 502 U.S. 1115, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992).

We deal here with standing claimed by visitors in the home of another. In *Minnesota v. Olson,* the Supreme Court held that an overnight guest has a reasonable expectation of privacy in the home of his host, and therefore has standing to challenge an entry into the host's home under the Fourth Amendment. 495 U.S. 91, 96–97, 110 S.Ct. 1684, 1687–88, 109 L.Ed.2d 85 (1990). "This court has held, after *Olson,* that a visitor has the burden of showing that he or she was an invited overnight guest in order to establish a reasonable expectation of privacy in the host's home." *Prophet, supra,* 602 A.2d at 1091. In *Prophet* we held the appellant lacked standing to contest the entry by the police into a friend's home in which he had taken refuge after a robbery-murder. The police arrived a few minutes after appellant and his accomplice, with the occupant's consent, had entered the apartment and apparently gone to a back bedroom. *Id.* We also noted that several other persons were present besides the appellant and his host. *Id.*

■ Conversely, "while an overnight guest has a reasonable expectation of privacy in the host's residence, a mere guest at a party does not." *Lewis, supra,* 594 A.2d at 545 (footnote omitted). In that case, we held that a party guest, who had arrived at an apartment during the course of the night, and was asleep in a bedroom when police arrived in the afternoon at 2:00 p.m., did not have standing to challenge the entry into the apartment resulting in his arrest. *Id.* at 543–44, 546. We noted that "a mere guest at a party" does not have a reasonable expectation of privacy in the residence of the host, and held that Lewis was merely a party guest and not an overnight guest because he had only taken a "nap" and there was a "manifest lack of privacy" in the bedroom in which he was napping.[9] *Id.* at 545–46; *see also United States v. Robinson,* 225 U.S.App. D.C. 282, 288–89, 698 F.2d 448, 454–55 (1983) (per curiam) (no standing for guest who was lying on bed in back room of house that was "chaotic" and used by seven or eight people).

■ To be sure, being an overnight guest is not the sole means by which one may claim an expectation of privacy in another's home. *Rose v. United States,* 629 A.2d 526, 530 (D.C.1993). But the case before us bears no real resemblance to *Rose.* There, this court held that a defendant had a legitimate expectation of privacy in an apartment that belonged to his close relatives, when he was a regular visitor and had his own key (and therefore an implied permission to enter and leave as he pleased), when he could expect to use the apartment "as a place of refuge," and when he was in the position to admit or exclude others from the apartment. *Id.* at 531. Likewise, in *Junior v. United States,* this court held that a defendant had standing to challenge the search of a home that he had used daily for the prior three years to care for the owner's retarded son, of whom the defendant was legal guardian. 634 A.2d 411, 413, 419 (D.C.1993). Both cases

---

9. Several other party guests had entered and left the bedroom during the defendant's nap, and another man was in the bedroom when the police arrived. *Id.* at 546. Lewis had presented evidence that he was invited to a party, but produced no evidence that he had been invited to or intended to stay overnight. *Id.*

thus featured a freedom and capacity of entry and use analogous to that of an inhabitant of the premises, just as an overnight guest is at that time using the premises as his temporary home in the same manner as a regular dweller.

Here, the trial court made a factual finding that appellants were not overnight guests for the night in question. "In reviewing the trial court's suppression order, we are bound to accept the court's factual findings, absent clear error." *United States v. Harris,* 629 A.2d 481, 488 (D.C.1993). As already recited above, the trial court conscientiously listed a number of aspects of the case upon which it relied in making this determination.[10] We could not say on this record that its conclusion was clearly erroneous.

Nor, in light of our existing case law, could we say that appellants otherwise met their burden of proof to demonstrate standing.[11] At oral argument, the government fairly characterized the sum total of other evidence at the suppression hearing tying appellants to Harrell's apartment to be: 1) appellants "sometimes" stayed there; 2) appellants had stayed in the apartment the previous night;

3) Harrell and Ellis were "good friends." There was no evidence that they had a key, that they were permitted to enter the apartment at their leisure, or that they could admit or exclude others from the apartment. *See Robinson, supra,* 225 U.S.App.D.C. at 288–89, 698 F.2d at 454–55 (record that did not indicate whether defendant was living in the place searched, whether or not he had a key, or the relationship to the owner was "disturbingly incomplete"). There was also no evidence as to how often they spent the night in the apartment or how much time they spent there in general. Even assuming that the trial court's discrediting of Harrell did not encompass her testimony about the previous night's occupancy, see note 10, *supra,* and that appellants properly preserved the issue, see note 11, *supra,* the standing created by *Olson* could not fairly be deemed to carry over unabated to the wee hours of the following morning.[12] We must conclude that appellants have failed to move themselves sufficiently beyond the limited relationship to the premises found inadequate in *Prophet* and *Lewis* to bring themselves within the ambit of *Olson* or *Rose.*[13]

10. The trial court expressly discredited Harrell's credibility. Any "factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous." *United States v. McNeal,* 955 F.2d 1067, 1072 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3039, 120 L.Ed.2d 908 (1992). Contrary to the appellants' assertion, *Ruffin v. United States,* 524 A.2d 685 (D.C.1987) (per curiam), *cert. denied,* 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988), did not require the trial judge to articulate a specific reason why he chose to disbelieve Harrell on this point. In *Ruffin,* we dealt with an issue on which the government had the burden of persuasion, *see id.* at 697, whereas here the appellants had the burden of persuasion on the standing issue. To the extent that appellants argue that the trial court improperly relied on the hearsay testimony of the anonymous caller, we note that the information in this call was only one element in the trial court's ruling on Harrell's credibility and on the standing issue.

11. The government challenges the right of appellants to argue any basis for standing other than as overnight guests on the night in question, asserting that no other theory was presented to the trial court. We think that the appellants sufficiently adumbrated the issue to warrant some further consideration on appeal.

12. In *Olson,* the defendant was arrested in his host's home early the following afternoon, when a guest might easily be expected to still be on the premises. In light of the trial court's explicit discrediting appellants' claim that they were spending the night of the 20th at Harrell's and of the intervening events, any carryover effect from the previous night's occupancy would have to be supported by more than in the record here.

13. To the extent that appellants argue that they were somehow ambushed by the government's failure to contest standing early on in the suppression hearing, we note that as soon as Harrell finished testifying, Ellis's counsel attempted to introduce her grand jury testimony, arguing that it "goes to the standing issue." *Cf. United States v. Caicedo–Llanos,* 295 U.S.App.D.C. 99, 103, 960 F.2d 158, 162 (1992) ("[A]ppellant carries the burden of proving the extent of his Fourth Amendment rights from the outset.... Thus, the failure to raise the issue before the District Court was appellant's own.").

The government argues that even if appellants have standing, the suppression motion should be denied under the doctrines of exigent circumstances or inevitable discovery (at least one eyewitness was previously acquainted with appellants). We need not reach those issues.

## IV.

 Finally, appellants argue that even if they did not have standing to challenge the legality of the police entry into the apartment, they still have a legitimate privacy interest in their persons, and therefore may challenge the subsequent search and seizure of their persons. We agree, and the government does not dispute, that appellants have standing to challenge an illegal detention of their persons. *See McNeal, supra,* 955 F.2d at 1071. The government maintains that the initial detention was a valid *Terry* stop, whereas the appellants argue that at least where the police are illegally upon the premises, the stop, because it occurred inside a residence, was more than "minimally intrusive," and thus constituted an illegal seizure.

In *McNeal, supra* note 10, the Sixth Circuit addressed a case quite similar to the facts presented here. The court found that the defendant had no reasonable expectation of privacy in the home of a third party. 955 F.2d at 1074. As a result, the court held, the legality of any detention or search of the appellant's person would "be judged within the context of a confrontation between citizen and law enforcement authority in a public place." *Id.* at 1076. The court noted that "[b]ecause appellant may not vicariously challenge the lawfulness of the official entry into [the third person]'s apartment, he may not charge that the search of his person—if otherwise legal—was the vitiated result of an illegal entry." *Id.* Other courts have upheld the validity of a limited stop within a home when the police are legally present. *See, e.g., Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981) ("a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted" (footnotes omitted)); *United States v. Brooks,* 2 F.3d 838, 842 (8th Cir.1993) (police may frisk suspects after legally gaining entry into residence by consent), *cert. denied,* — U.S. ——, 114 S.Ct. 1117, 127 L.Ed.2d 427 (1994). We agree with the *McNeal* court that to allow an appellant to challenge the legality of police presence in a dwelling in such circumstances would simply reinstate standing in another guise. Further, with legality of entry not a factor, we agree with the trial court that on the record here, there was sufficient evidence to show reasonable articulable suspicion and to justify a *Terry* stop, which ripened into probable cause as events transpired in the apartment.

*Affirmed.*