*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 21-FS-0478

IN RE J.F.S., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(2020-DEL-000282)

(Hon. Andrea Hertzfeld, Trial Judge)

(Argued April 12, 2023                         Decided August 31, 2023)

*Joel R. Davidson* for appellant.

*Lucy E. Pittman*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General at the time, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General were on the brief, for appellee.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: J.F.S., a juvenile, was found to have aided and abetted first-degree murder and related offenses. Some of the more incriminating evidence against him was recovered from a police search of his cell phone. J.F.S. now argues that both the initial seizure and the subsequent search of his cell phone violated his Fourth Amendment rights, so the trial court should have suppressed the evidence recovered from his phone and certain fruits of that search, described below.

The government counters that J.F.S.'s mother consented to the seizure of the phone, and that the subsequent search was authorized by a valid search warrant. Two issues lie at the heart of this appeal: (1) whether J.F.S.'s mother had the actual or apparent authority to consent to the seizure of his phone, and (2) whether the warrant was sufficiently particularized to authorize the search of his phone.

We have never before addressed the scope of a parent's authority to consent to the seizure of their child's phone. Like most Fourth Amendment questions, this is a fact-specific inquiry. On these facts—where J.F.S. was a minor who was living at home, his mother bought the phone, the phone was in her name, and she had asserted her authority to confiscate it in the officers' presence—J.F.S.'s mother had the apparent authority to consent to the seizure of J.F.S.'s phone. As for whether the warrant was sufficiently particularized to authorize a search, this case is on all fours with *Abney v. United States*, 273 A.3d 852, 865-67 (D.C. 2022). As in that case, here "the officers could reasonably have believed that the warrant was neither overbroad nor insufficiently particular," *id.* at 865, so suppression was not warranted.

We therefore reject J.F.S.'s Fourth Amendment arguments, as well as a challenge he makes to the sufficiency of the evidence, and affirm.

**I.**

*The Murder*

Andy Bonilla was shot and killed while walking along Sherman Avenue in Columbia Heights, in January 2020.  The murder was captured on video surveillance footage, which showed a black sedan driving down the street, small puffs of dust—consistent with bullet strikes—appearing on the façade of the building next to Bonilla, and Bonilla then collapsing.  Bonilla was hit and killed by a single shot that had apparently been fired from inside the car.  The car was later identified as a Honda Accord, which was recovered the same day.  It had been stolen from Virginia.

On the day of Bonilla's murder, J.F.S., who was 15 years old at the time, purchased the stolen Honda Accord for $100.  He and his friend B.V. (also a juvenile) drove to pick up their other friends Brian Santos and Alvero Lopez, and the four of them drove around Columbia Heights.  According to a series of texts J.F.S. sent to a friend an hour before Bonilla was shot, they were "looking for da opps," an apparent reference to the opposition or rival crew, armed with three or four guns and 100 rounds of ammunition.  Four minutes before the shooting, J.F.S. used his phone to record a video depicting a gun in his lap.

The evidence showed that, as the car approached Sherman Avenue, B.V. was driving and J.F.S. was sitting in the front passenger seat, with Santos and Lopez in the back. B.V. pointed to Bonilla and said, "that's Andy." Several occupants of the car opened fire on Bonilla, killing him. After the shooting, they continued to drive around, smoked weed, and stopped at a Safeway, before going their separate ways about two hours later. Minutes after separating from the group, J.F.S. texted another friend that he was "in deep shit" but "[d]on't make it hot," meaning that the friend should not draw police attention to it. He then suggested they should "t[e]xt on snap," referring to Snapchat, a phone application where messages automatically disappear after they are read.

*Seizure of the Phone*

About a month later, Officers Kevin Romero and Gerard Baretto were patrolling near J.F.S.'s house after an unrelated violent crime had occurred in the area. Officer Romero saw J.F.S. walking down the street and thought he looked like a suspect in an unrelated case. Both officers got out of their vehicle and approached J.F.S., who by this time was on the front porch of his house. They began talking to J.F.S., asking who he was and where he lived. J.F.S.'s mother, S.S., joined the officers on the porch and began complaining that J.F.S. never listens to her and that

he had been going out into the streets against her instructions. J.F.S. was using his phone at the time, and S.S. told him, "give me that phone right now." J.F.S. ignored her. S.S. told the officers that J.F.S. constantly disobeyed her and Officer Baretto advised, "[s]tart with the cell phone, take away his cell phone." S.S. explained that she had already disconnected the cellular service so the phone could only be used on Wi-Fi. She said, "[i]f you guys can take it away from him now, I'd be really thankful" and "tell him to give it to you." Neither officer nor S.S. took the cell phone at this point.

S.S. told the officers that she was worried for her family's safety. She relayed that two of J.F.S.'s friends had been murdered and police detectives had previously told her that J.F.S. was in danger too. Those detectives had told her that J.F.S. likely knew who murdered Bonilla, but that he wasn't telling them anything. S.S. and the officers spoke for a while about her concerns and, at the end of the conversation, Officer Baretto asked whether S.S. still wanted J.F.S.'s cell phone. S.S. said to J.F.S., "Yes, give me your phone." J.F.S. refused. Officer Baretto said "give it up" and touched J.F.S. on the wrist. J.F.S. gave the phone to his mother. The officers left.

Back in their vehicle, the officers called the homicide branch to report S.S.'s concern for her son's safety. A homicide detective who was apparently familiar with the investigation into Bonilla's murder told the officers to see if S.S. would give them the phone, so they returned to the house and spoke with S.S. J.F.S. was not present for this conversation. S.S. told the officers that she bought the phone for J.F.S. and that it was under her name. Officer Baretto relayed the detective's belief that the "phone may have information that could help [them] solve what happened" with the crimes in the area, and could help with her and her family's safety. He suggested that she turn the phone over to the police "voluntarily." S.S. said she "d[idn't] have any problem" with that. In fact, S.S. said she had already told J.F.S. that she had given the phone to the police so he wouldn't ask for it back, when in fact she had given it to her sister for safekeeping. J.F.S.'s father joined the conversation and both he and S.S. confirmed that they did not have the passcode to the phone and did not believe J.F.S. would give it to them. S.S. retrieved J.F.S.'s phone from her sister and gave it to the officers.

The officers returned to their vehicle and reported to the homicide branch that they had the phone. A homicide branch detective asked them to bring J.F.S. and S.S. in for an interview. The officers returned to the house a third time, spoke with J.F.S.

and S.S., and transported them both to the homicide branch so that officers could interview J.F.S.

*Search of the Phone*

Homicide detective Jonathan Jordan sought a warrant to search the phone. In his 21-page affidavit in support of the requested warrant, Detective Jordan laid out in detail the evidence the police had in connection with the Bonilla murder, including GPS tracking from the stolen Honda and the video surveillance footage showing Bonilla being shot. The affidavit explained that Santos and B.V. had been arrested for a separate murder in the days after Bonilla was killed. On their phones, officers found text messages tying them to Bonilla's murder. Several texts on the phones mentioned J.F.S.'s first name. One string of texts in particular placed J.F.S. with B.V., Santos, and Lopez in the stolen car at the Safeway about an hour after the murder: someone texted B.V., "[W]here y'all at[?]", to which B.V. responded, "safeway" with "al j[.][1] bryan," and confirmed that they were "still in the uu" (apparently a reference to the "unauthorized use" of a vehicle). The affidavit stated that officers believed that J.F.S. was likely in the car at the time of the murder and

---

[1] The text used J.F.S.'s first name.

that his phone likely contained evidence relating to the murder. The affidavit also identified different types of evidence—from videos to text messages to phone calls to GPS data—that Detective Jordan expected they might recover from the phone, similar to what they had recovered from the other suspects' phones. A judge issued the warrant in March 2020.

Upon searching the phone, officers found three key pieces of evidence: J.F.S.'s texts about "looking for da opps" while heavily armed, about an hour before the murder; the video of the gun in J.F.S.'s lap filmed four minutes before the murder; and his texts shortly after leaving the car that he was "in deep shit."

J.F.S. was arrested and brought to the police station for another interview. He was read his Miranda rights and agreed to waive them. Detective Jordan laid out the evidence that had led the police to suspect J.F.S.'s involvement in the murder, including his text messages and video of the gun in his lap. He then asked J.F.S. a series of questions about the murder. J.F.S. explained that, when his friends invited him to hang out, he had thought they would just smoke weed together as usual: he did not know the plan was to shoot an "opp." until someone else in the car told him so. He said he got into the car unarmed, though he saw that the other three were armed. When they neared Sherman Avenue, B.V. had asked him whether he wanted

to drive or shoot and he had said neither. J.F.S. acknowledged that he at one point had a gun in his lap, as depicted in the video recovered from his phone, but explained that B.V. had taken the gun out of his lap and fired it at Bonilla, while Santos and Lopez also fired at Bonilla from the back seats. According to J.F.S., he did not fire a gun; he did not even know who Bonilla was before the shooting.

J.F.S. was charged with first-degree murder while armed and a host of related offenses.

*Motions to Suppress*

J.F.S. filed two motions to suppress the evidence recovered from his cell phone. In the first, he argued that the seizure of his phone violated the Fourth Amendment. He sought to suppress the contents of his phone and his statements at the interview as the fruits of an unlawful seizure. The court denied the motion. The court found that S.S. had voluntarily given the phone to the officers and that she had the apparent authority to consent to the phone's seizure. The court reasoned that the following facts evinced S.S.'s authority over the phone: she bought the phone; it was in her name; she had terminated the cell phone plan so that J.F.S. could only use the phone on Wi-Fi; and, after taking the phone, she gave it to her sister to ensure he could not get it back. The court noted that the officer's suggestion that S.S. take the

phone away from J.F.S. to punish him indicated their belief that S.S. had authority over the phone. And the court finally noted that S.S. herself had told J.F.S. to give her the phone in front of the officers, and though J.F.S. had refused, a "child's insubordination regarding his mother's demands" did not undermine the conclusion that "as a parent, [S.S.] had the ability to control access to the phone."

Days before a hearing on that suppression motion, this court decided *Burns v. United States*, in which we held that two cell phone search warrants violated the Fourth Amendment because they were overbroad and insufficiently particularized. 235 A.3d 758, 767 (D.C. 2020). J.F.S. filed a second suppression motion arguing that, under *Burns*, the search warrant for his phone was likewise overbroad and lacking in particularity. The court also denied that motion. The court found that, unlike in *Burns*, Detective Jordan did not make a "generic request for information found, generally, on cellular phones." Rather, the court found, "the category of information sought [wa]s, at its most broad, limited only to that related to the murder" of Bonilla and, within that category, was subcategorized into an "itemized list of relevant topics and only as such information relate[d] to the murder." Even if the warrant did run afoul of *Burns*, the court found that Detective Jordan acted reasonably within the bounds of the law as it existed at the time the warrant was obtained, pre-*Burns*, and so suppression was not called for.

*The Trial*

At a bench trial, the court found that the evidence did not establish beyond a reasonable doubt that J.F.S. had pulled a trigger himself, meaning the court could not find him involved in Bonilla's murder as a principal. It found, instead, that J.F.S. had aided and abetted the various offenses. The court credited J.F.S.'s statements that, before his friends spotted Bonilla, "he may not have known what would ultimately happen that day." But—based on the fact that J.F.S. knew the plan was to look for the opposition and was bragging about carrying loaded guns, one of which he had in his lap mere minutes before the murder—the court found that J.F.S. had acted in furtherance of the murder plan and that he had an intent to kill that was premeditated and formed after a period of deliberation. The court found J.F.S. involved in all charges (except the lesser-included offense of second-degree murder). J.F.S. now appeals.

**II.**

J.F.S. makes two arguments: (1) the search and seizure of his cell phone violated the Fourth Amendment, so the evidence found on his cell phone and his subsequent statements in the police interview should have been suppressed, and

(2) there was insufficient evidence to find him involved in first-degree murder. We address each in turn.

## A.

J.F.S. challenges both the seizure and the subsequent search of his cell phone. The pertinent facts underlying these Fourth Amendment challenges are not in dispute, and "[w]e review the trial court's legal conclusions de novo." *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc).

### 1. Seizure

J.F.S. first argues that his mother lacked the apparent authority to consent to the seizure of his phone. We disagree.

Officers may conduct a warrantless seizure if they receive consent from someone with the actual or apparent authority to consent. *See Ashby v. United States*, 199 A.3d 634, 649 (D.C. 2019). This can be the owner of the property or a third party. *Id.* The relevant question is simply whether "the facts available to the officer at the moment [would] warrant a [person] of reasonable caution in the belief that the consenting party had authority" to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188

(1990) (quotation omitted); *see also Ashby*, 199 A.3d at 649 (relevant standard is the officer's reasonable belief).

A third party has the authority to consent to a search or seizure if they have "joint access [to] or control" over the property such that the property's owner is thought to have "assumed the risk" that they might permit a search or seizure of the property. *See United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) (discussing third party consent to search). The nature of a third party's access or control determines what they may permit others (including the police) to do with that property, and a third party may "permit[] others to do no more than [they] may do on [their] own." 4 Wayne R. LaFave, *Search & Seizure* § 8.3 (6th ed. Oct. 2022 update) (quoting *People v. Blair*, 748 N.E.2d 318, 325 (Ill. App. Ct. 2001)).

The type of access or control that allows a third party to consent to a search is thus different from that which allows the party to consent to a seizure.[2] To consent to a search, the third party must have (or appear to have) the authority to look through the property themselves. *See, e.g., Ashby*, 199 A.3d at 649-50 (third party who kept

---

[2] The doctrine of third party consent appears far more frequently in the context of searches than in the context of seizures. As best we can tell, this court has never confronted a question regarding a third party's authority (apparent or actual) to consent to a seizure.

his belongings in basement and went to check on them almost every day had actual authority to consent to search of basement). And to consent to a seizure, the third party must have (or appear to have) the authority to take possession of the property themselves. *Cf. Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring) ("Since seizure of [] an object threatens only the interest in possession, circumstances diminishing that interest may justify exceptions to the Fourth Amendment's usual requirements."). This is because searches and seizures implicate different interests: a search generally implicates an individual's interest in privacy, while a seizure of property primarily implicates their possessory interest in that property. *See Soldal v. Cook Cnty.*, 506 U.S. 56, 63 (1992).

A third party may have the authority to consent to a search but not a seizure, and vice versa. "[T]he two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the search of a stopped vehicle does not necessarily deprive its owner of possession." *Brown*, 460 U.S. at 748 (Stevens, J., concurring). Take, for instance, a man who gives his friend a locked briefcase with instructions never to look inside it. The friend would have no authority to consent to a search of the briefcase because he himself had no authority to look inside. *See United States v. Basinski*, 226 F.3d 829, 835 (7th Cir. 2000). But he might have

authority to consent to a seizure, because he had the authority to exercise domain over the briefcase. Conversely, consider a man who allowed his father unfettered access to his computer whenever the father liked. The father would likely have the authority to consent to a search because he had total access to the computer's contents, but he could not consent to a seizure because he had no right to deprive his son of the computer's possession. *See Blair*, 748 N.E.2d at 324-26.

This case presents the narrow issue of whether S.S. had the apparent authority to consent to a seizure of J.F.S.'s phone.[3] The answer to that question turns on S.S.'s apparent authority to take protracted possession of J.F.S.'s phone.[4] The government argues that S.S. had that apparent authority because (1) she had paid for the phone, (2) it was in her name, and (3) she had already exercised that authority when she confiscated the phone and gave it to her sister before the police sought to seize it themselves. J.F.S. counters that his refusal to hand over the phone despite his

---

[3] Because we ultimately find that S.S. had the apparent authority to consent to the seizure of J.F.S.'s phone, we need not decide whether she had the actual authority to do so.

[4] If she had permission to take only momentary possession of the phone—for example, if she had been authorized to use it only to call for help in an emergency—that would not be sufficient authority to consent to a more protracted police seizure. In that circumstance she would be conferring to the police more authority over the phone than she had herself.

mother's demands, made in front of the police, showed that S.S. did not appear to have the authority to confiscate his phone. He further argues that the fact that neither of his parents knew the passcode shows that they did not appear to have the authority to give his phone to the police. We are not convinced by either of J.F.S.'s arguments.

There was strong evidence supporting S.S.'s apparent authority to take possession of J.F.S.'s phone. J.F.S. was a minor who lived with his parents. S.S. paid for the phone, and it was in her name. S.S. acted as though she had the authority to confiscate his phone: ordering him to give it to her and then, when he finally did, giving it to her sister so he could not get it back. J.F.S.'s refusal to hand over his phone upon demand does not undermine this conclusion. As the trial court correctly noted, a child's defiance of their parent's authority does not show that the parent lacks authority over them. It is common for children to refuse to do things their parents ask of them—but a minor child saying "no," "stay out of my room," or the like does not suggest that the parent lacks authority to override them. It was entirely reasonable for the officers to view J.F.S.'s refusal to give his mother his phone as an instance of him defying S.S.'s authority, not as an indication that she lacked it.

The fact that the phone was passcode protected speaks to S.S.'s authority to consent to a search of the phone, not her authority to seize it. The officers' seizure

of the phone did not, by itself, enable the police to see any of the phone's contents. It was the search that infringed on those privacy interests, and the search was conducted pursuant to a warrant. Whether that search was legal depends on the validity of that warrant, which we turn to now.

## 2. Search

J.F.S. argues that the warrant authorizing the officers to search his phone was overbroad and insufficiently particularized to pass Fourth Amendment scrutiny. We need not reach this issue because we hold that the officers could have reasonably believed that the warrant was sufficiently particular, so suppression is not justified under the good faith exception to the Fourth Amendment's exclusionary rule.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. These "dual constitutional mandates of probable cause and particularity . . . are meant to deny the police the ability 'to rummage at will' through a person's private matters." *Burns*, 235 A.3d at 771 (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009)). Evidence found pursuant to an invalid warrant will generally be excluded from trial, but there are exceptions to that exclusionary rule. *Id.* at 778; *see Wong*

*Sun v. United States*, 371 U.S. 471, 488 (1963). The government invokes the good faith exception here, which provides that the suppression of evidence recovered even via an invalid warrant is not justified if "the officers who executed the warrant acted in objectively reasonable reliance on the issuing magistrate's finding of probable cause." *Burns*, 235 A.3d at 778 (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

In arguing that the warrant here was insufficiently particularized, J.F.S. relies exclusively on *Burns*. In *Burns*, we held that two warrants were insufficiently particularized where they "imposed no meaningful limitations as to how far back in time police could go or what applications they could review and, instead, endorsed the broadest possible search without regard to the facts of the case or the limited showings of probable cause set forth in the affidavits." 235 A.3d at 775. The affidavits supporting the search warrants in *Burns* supplied probable cause to search the phone for text messages sent to one person on one particular day, GPS data showing the phone's location on two days, and a single phone call. *Id.* at 774. On the basis of this slim showing of probable cause, the warrants authorized the seizure of "all records" and "any evidence" on the phones relating to murder, and sanctioned the search of categories including "schedule and travel information; saved usernames and passwords; documents; and '[r]ecords of Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.'" *Id.* These "generic categories," we said, "cover[ed] virtually all of the different types of data found on modern cell phones" and vastly exceeded the scope of the probable cause outlined in the affidavit. *Id.* at 775. We further rejected the government's argument that the good faith exception should apply, concluding that "the affidavit submitted in support of the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 779 (quoting *Leon*, 468 U.S. at 923).

The affidavit in *Burns* is worlds apart from the one at issue here, which supplied strong reason to believe that J.F.S. was involved in Bonilla's murder and detailed with particularity the types of evidence officers could expect to find on his phone. Perhaps J.F.S. is arguing—it is not entirely clear—that the warrant lacked particularity in the digital "places" to be searched, where it permitted officers to scour all manner of data on the phone, including that which could not conceivably relate to evidence of a crime (imagine a Solitaire app that records the user's historical scores and nothing else). *Cf. Burns*, 235 A.3d at 775. But we need not resolve whether this warrant complies with the principles we announced in *Burns* on all fronts because, even if it did not, the good faith exception applies. This court decided

*Burns* after the warrant issued and the search was conducted in this case. So, whether or not the warrant in this case complies with the Fourth Amendment principles we explicated in *Burns*, pre-*Burns*, officers could reasonably have relied on the warrant that they had obtained. We addressed that same question in *Abney v. United States*, where we skipped the inquiry into whether a warrant was sufficiently tailored and particularized to pass scrutiny under *Burns*, concluding instead that the officers could at the time have reasonably believed that it was. 273 A.3d at 867. We reach the same conclusion, and for much the same reasons, here.

In *Abney*, we held that officers relied in good faith on a warrant issued before *Burns* was decided. *Id.* at 867. At the time that warrant was issued, courts had generally held cell phone search warrants to be sufficiently tailored and particularized where they "limited the officers to searching for and seizing evidence of a specific crime." *Id.* at 865 (citing *United States v. Bass*, 785 F.3d 1043, 1049-50 (6th Cir. 2015)). That was the case in *Abney*. *Id.* The affidavit established probable cause to believe that the phone's owner was a suspect and that the phone "contained a range of relevant evidence" about that crime, distinguishing it from the "slender" showing of probable cause in the *Burns* affidavit. *Id.* at 867.

This case is on all fours with *Abney*. The search warrant here was supported by a detailed affidavit, which explained why the officers had probable cause to believe that J.F.S. was involved in the murder and why a broad swath of data on the phone might contain relevant evidence. For instance, the affidavit stated that, based on Detective Jordan's experience investigating these kinds of crimes, he would expect to find messages about planning the crime in the phone's messaging apps; "trophy photos" of weapons in photo storage apps; and searches of police investigations into the crime in the internet search history. This affidavit provided strong "indicia of probable cause" to believe that the phone would contain evidence in a broad range of places, unlike the three discrete items that police had cause to search for in *Burns*. 235 A.3d at 778-79. And the search warrant limited the officers to searching for evidence pertaining to the murder, for which J.F.S. was a suspect, in keeping with the particularity standard as it was generally understood before *Burns*.[5] *See Abney*, 273 A.3d at 865. The officers could therefore have relied on the search warrant in good faith, and suppression was not warranted.

---

[5] J.F.S. makes no argument that the general understanding of the particularity standard changed in any relevant way between 2018, when the warrant in *Abney* was issued, and March 2020, when the warrant here was issued.

**B.**

Finally, J.F.S. argues that there was insufficient evidence to prove that he aided and abetted first-degree murder. When determining the sufficiency of the evidence, we "assess the evidence in the light most favorable to the government" and ask whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Walker v. United States*, 167 A.3d 1191, 1201 (D.C. 2017) (quotation omitted). "Any 'factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous.'" *Hill v. United States*, 664 A.2d 347, 353 n.10 (D.C. 1995) (quoting *United States v. McNeal*, 955 F.2d 1067, 1072 (6th Cir. 1992)).

To prove J.F.S. aided and abetted first-degree murder, the government was required to prove that he "acted with premeditation and deliberation and intent to kill"—the same intent requirement as for the principal. *See Wilson-Bey v. United States*, 903 A.2d 818, 830 (D.C. 2006) (en banc). And it had to show that his aiding and abetting was "deliberate, not accidental," *Walker*, 167 A.3d at 1202: that he "in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it

succeed." *Wilson-Bey*, 903 A.2d at 840 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). J.F.S. argues that the evidence was insufficient with respect to both the intent requirement and the requirement that he actively participated in the venture. We disagree.

The evidence supports the court's finding that J.F.S. had an intent to kill that was premeditated and deliberate. J.F.S. knew well in advance that the plan was to shoot someone. An hour before the shooting, he told a friend he was "looking for da opps" with at least three guns and 100 rounds of ammunition at his and his friends' disposal. He told Detective Jordan that B.V. had asked him whether he wanted to shoot or drive, and there is video evidence of him holding a gun four minutes before the murder. We have said that "[c]arrying a gun to the scene of the murder is 'highly probative of premeditation and deliberation' because it suggests that the defendant arrived on the scene with a preconceived plan to kill." *Busey v. United States*, 747 A.2d 1153, 1161 (D.C. 2000) (quoting *Frendak v. United States*, 408 A.2d 364, 371 (D.C. 1979)). Here, not only was there evidence of J.F.S. carrying a gun, but there was also evidence that J.F.S. knew the plan was to shoot someone. Given all the evidence, including the fact that J.F.S. and his friends were heavily armed, the trial court was within reason to infer that the plan was not only

to shoot someone, but to kill them. This evidence suffices to show that J.F.S. had an intent to kill that was premeditated and deliberate.

There is also sufficient evidence to support a finding that J.F.S. actively participated in the venture. J.F.S. bought the stolen car for $100. He "look[ed] for da opps." He held a gun in his lap minutes before the murder. Though he knew that the plan was to shoot someone, he never tried to get out of the car. He even kept driving around with the other occupants of the car for almost two hours after the shooting. *See Walker*, 167 A.3d at 1202-03 ("That [the defendant] demonstrably knew his companions planned a murderous attack on [the victim] and never withdrew or disassociated himself from it, but instead stayed with them from start to finish, was itself sufficient to establish implied approval, and hence aiding and abetting [of second degree murder]." (quotation omitted)). This evidence suffices to show that J.F.S. actively participated in the venture.

**III.**

We affirm.

*So ordered.*